[Civ. No. 25985. Second Dist., Div. One. Aug. 29, 1962.]

HARRY C. HARDY et al., Plaintiffs and Respondents, v. ASA B. CARMICHAEL et al., Defendants and Appellants.

Henry C. Rohr, Joseph O. Edwards and Ernest G. Cade for Defendants and Appellants.

Anderson & Griffin and William T. Anderson for Plaintiffs and Respondents.

WOOD, P. J.—Plaintiffs Mr. and Mrs. Hardy purchased a dwelling house from defendants Mr. and Mrs. Carmichael for $13,125. The purchase agreement was evidenced by a "deposit receipt" and by escrow instructions. A provision in the re-

ceipt was: "Seller to furnish Termite clearance showing property free & clear of all visible evidence of fungi, Termites & Dry rot." A provision in the instructions was: "Current termite, fungus and dry-rot inspection report of accessible areas to be furnished by seller in escrow. Cost of work to clear visible existing infection, if any, to be paid from seller's funds." Defendant McKeever made the termite inspection and report. This is an action against the sellers and the inspector for damages allegedly resulting from misrepresentations concerning the termite, fungus, and dry-rot condition of the house. In a nonjury trial judgment was for plaintiffs for $9,154.51. Defendants appeal from the judgment and from the order denying their motions for a new trial.

Appellants Carmichael contend that the court erred (1) in rulings as to admissibility of evidence, and (2) in determining the amount of damages, if any damages should have been allowed.

Appellant McKeever contends that there was no contractual relationship between him and the plaintiffs, and that the evidence was insufficient to support the findings as to liability and damages.

A real estate agent, Mrs. Shields, with whom the property had been listed for sale, showed the property to plaintiffs on May 1, 1956. While plaintiffs were looking at the one-story house (during a period of approximately 15 minutes), Mrs. Carmichael told them that the house was a solid concrete house—that the floors, walls, and roof were solid concrete. At that time she rapped on the wall. Mr. Hardy said that if he decided to make an offer for the property, he would ask for a termite report and for possession by May 23. Thereafter on May 1, the plaintiffs agreed to purchase the property. The deposit receipt and the escrow instructions, referring to the termite report, were signed by the parties. Later, and before plaintiffs took possession on May 23, Mrs. Carmichael told Mr. Hardy that he did not have to worry about termites at that place—that the house was solid concrete. Defendant Mr. McKeever was employed by the real estate agent to make the termite inspection. The report, which was filed in the escrow, states that the type of construction is concrete floors, walls, and roof; and that there were no infestations or indications of termites, dry rot, or fungus—that the report was "limited to what is visible" on the day the inspection was made (May 5, 1956).

Plaintiffs took possession on May 23.

On August 20, while plaintiff Mr. Hardy was demolishing

the outside stairway which extended from the front patio to the roof, he found that the house was not of solid concrete construction, but that it had wooden studs with loose concrete aggregate between the studs; and he saw that all the studs which he had uncovered were rotten with dry rot, fungus, and termites.

Mr. Hardy (plaintiff) testified that after he discovered the damage to the house he called Mr. McKeever, who then came to the house and said: ''I sure goofed on this one; I sure pulled a booboo, but here is the way it happened. I came in. Mrs. Carmichael told me that this house was solid concrete. She got up and tapped on the wall for my benefit. I took her at her word; went back and examined the washroom addition, examined the garage and I left.'' (It is agreed that there was a frame and stucco addition to the rear part of the house, which addition was clear of termite or fungus damage.) Mr. Hardy testified further that Mr. McKeever admitted that he should have seen the fungus damage on the frame of the dining room door; when he (Hardy) examined the plumbing access area he found that the studding and mud sill extended about 5 inches below the bottom of the floor slab, that earth was in contact with the studding and sill, and that the studding and sill were rotten; he removed a board from a place near the kitchen sink and found that the studs were rotten; the first time he saw the termite report was when he was at the escrow office of the bank; he relied upon the report; he sold the property for $9,800 about two years after he purchased it.

Mr. Forbes, an expert in the field of termite inspection, who was called as a witness by plaintiffs, testified that he inspected the house on August 22, 1956; the timbers under the steps where the steps had been removed were damaged by fungus and termites; there was slight evidence of termite infestation at the front door jamb; at the base of the front door, discoloration from a mud tube of termites was plainly visible; the wood at the door between the dining room and kitchen appeared to be painted over fungus infection; in the living-room closet termite tubes were visible on the plaster; by using a probing implement he discovered that the casing of the exterior doors extended below the floor slab and that there was evidence of termite damage at those doors; on the exterior wall he saw a crack around the foundation line of the building; at the plumbing access area which was in a closet behind the bathtub he saw that the wood framing had been damaged

by fungus and termites, that the mud sill had rotted, and that the studding was infested with termites; at the place where the stairway had been removed he found that a coarse mixture of rock, cement, and sand had been poured between the frame studding.

Mr. Miller, an investigator for the Structural Pest Control Department of the State of California, who was called as a witness by the plaintiffs, testified that on October 2, 1956, he investigated the property here involved; he noticed, at the place where the stairway had been removed, that there was termite and fungus damage at the entrance to the living room and at the bottom of the door jambs; there was extensive fungus damage to the door jambs in the dining room; there was damage under the kitchen sink where plasterboard had been removed; the construction of the house was visible through the bathroom inspection plate; the wood framing and the foundation of the house were below the interior grade; at an open inspection hole which was in an exterior wall, he saw active termites; if there is visible termite damage at a particular place, it should be included in the report.

Mr. Clarke, a building contractor of extensive experience, who was called as a witness by plaintiffs, testified that the house was a frame stucco building with a cheap grade of concrete poured between the studs; he examined the studding which was under the sink, at the plumbing access door, and at the stairway, and he found that the studding was rotten; in his opinion the condition of the studding was caused by termites or dry rot; the foundation was extremely low and the sill was on top of it; the studding was on the sill and the concrete floor had been poured after the studding had been placed; dirt was in contact with the studding and was above the foundation in some places; in his opinion the house was unsafe to live in and it could not be restored to a safe standard; he suggested to the plaintiffs that the house be demolished; it would cost $1,265 to demolish the house; in his opinion the reasonable value of the lot was $8,500.

Mrs. Shields, the real estate agent, testified that while she and the plaintiffs were at the house, Mrs. Carmichael said to them: "It is a solid concrete house"; when Mr. McKeever was at her office, he said: "I guess I goofed on this one."

Mrs. Hardy (plaintiff) testified that Mrs. Carmichael told her that the house was a solid concrete house; when Mr. McKeever was at the house, after the damage had been discovered, he said that Mrs. Carmichael had told him that it was a

solid concrete house; he also said that he tapped on the wall and it sounded solid, and then he inspected the addition and the garage and they seemed fine; he also said, "I goofed."

Mrs. Carmichael (defendant) testified that she was not at the house when the agent and the plaintiffs were there; she did not tell the agent or Mr. McKeever that it was a solid concrete house; she knew that it was a stucco house; while she was living in the house certain alterations were made in the kitchen, but she did not see any rotten wood during the time that work was being done; the house had been sandblasted and painted about three years before it was listed for sale.

Mr. Carmichael testified that when the kitchen remodeling was being done the studding on one side of the kitchen was visible and was in good condition; he did part of the work on the exterior wall of the kitchen, and there was no infestation or dry rot at that place.

Mr. McKeever (defendant) testified that he was employed by the real estate agent to make a termite investigation of the property; he sent his report to the bank (where the escrow was pending); he understood that the property was "changing hands," but he did not know who was to be benefited by the report; when he went to the house to make the inspection, Mrs. Carmichael told him that it was a concrete house; he tapped around the baseboard and on the partition walls, and they sounded like concrete; the walls in the closet under the front stairway were plastered and there was no indication of trouble at that place; he tapped around the exterior of the building and crawled under the back addition, and he found no evidence of infestation; he went upon the roof and tapped it, and it sounded like concrete; he did not look for a plumbing access door; he ran "a blade" where there would be a concrete slab by the door casings; he was not looking for a mud sill line and therefore did not see a crack on the exterior walls; there was very thick stucco on the building; he was not in the closet in the rear bedroom, since he had already determined that the building was solid concrete; on his second visit to the house he saw the damage to the dining room door, and he looked through the plumbing access door and saw heavily infested wood.

The house was declared unsafe by the Building Department of Glendale (in which city the house was located). By reason of such unsafe condition, caused by termites, fungi, and dry rot, the house was demolished.

Some of the findings of fact were as follows: The plaintiffs paid $13,125 for the property. The actual value of the property at the date of the purchase agreement was $8,500. Defendant Mrs. Carmichael, acting for herself and Mr. Carmichael, represented to plaintiffs, prior to the agreement, that the house was of solid concrete construction and free of termites, dry rot or other infestations. At the time of making such representations, those defendants knew that the property was not free from such infestations and that the building was not of such construction. Those defendants concealed the true condition of the building. Plaintiffs were induced to purchase the property by, and they relied upon, such representations of those defendants in addition to the negligent conduct of defendant McKeever. Defendants Carmichael agreed to provide plaintiffs with a termite clearance showing the property to be visibly free of termites, dry rot, and fungus. The house was not free therefrom and was infested so badly throughout with such infestations that it was beyond repair and unsafe for occupancy. Plaintiffs had no knowledge of the true condition of the house until after they had taken possession thereof. In addition to the loss of $4,625 in purchasing the property, plaintiffs suffered damages in the amount of $4,529.51, consisting of various amounts expended by plaintiffs (as specified in the findings, for such items as escrow fee, cost of moving, improving the property, taxes, etc.).

Further findings of fact were: Defendant McKeever was employed by the other defendants to inspect and report the condition of the house with respect to such infestations. He negligently conducted such investigation, and said report ''was made and intended for the purpose that plaintiffs rely thereon.'' He filed his report in the escrow, representing that the building was visibly free of termites, fungus, and dry rot. He knew that the report was for the benefit of plaintiffs. Plaintiffs signed their acknowledgment of the report and relied upon it, but they did not thereby waive the fraud of defendants Carmichael or waive the negligence of defendant McKeever. The representations in the report were false. Defendants Carmichael represented to him that the house was of solid concrete construction, free of termites or other infestations.

Appellants Carmichael contend that the court erred in failing to sustain their objection to the introduction of any evidence against them. The basis for their objection was that on March 21, 1958, they served on plaintiffs' former attorney a

"Request for Admissions of Facts," and that, as of the date of trial on February 8, 1961, the plaintiffs had not answered any of the requests. That document, filed on March 24, 1958, shows there were fourteen requests. (It may be stated generally that the requests pertained to all the material factual issues in controversy; and that an admission of the alleged facts stated in some of the requests would mean that plaintiff should not recover damages.) Appellants argued in support of their objection that plaintiffs, by reason of failing to answer the requests, admitted the facts stated therein and there were no issues to be determined, and they were entitled to summary judgment of dismissal. Section 2033 of the Code of Civil Procedure (which became operative in January 1958) provides in part that: "After service of summons or the appearance of a party, any other party . . . may file and serve upon such party . . . a written request for the admission . . . of the truth of any relevant matters of fact set forth in the request. . . . Each of the matters . . . shall be deemed admitted unless, within a period designated in the request . . . the party to whom the request is directed files and serves upon the party requesting the admission" a written denial of the matters or an objection thereto. The judge asked present counsel for plaintiffs if he had had previous notice that the requests had not been answered. He replied in the negative, and stated further that this was a surprise to him, that the former counsel had been ill, that present counsel had been substituted as counsel about three weeks previously, and he would like to have time in which to answer the requests. In overruling the objection and denying the motion to dismiss, the judge said that the case was pretried on March 21, 1958, that counsel for defendants Carmichael participated in the pretrial conference, that the pretrial order stated there was no further discovery proceeding, and that on the next day said counsel for those defendants mailed the request for admissions. The judge said further that if counsel felt aggrieved because the answers had not been made he could have made a motion regarding it; that the case had been continued seven times and counsel had not made such a motion, and had let the case go to trial. Appellants Carmichael argue to the effect that under said section 2033 they could make the request at any time (with an exception not applicable here) and that such a statute takes precedence over the Judicial Council or Superior Court Rules regarding pretrial. The statement of the trial judge adequately covers the point involved. Rule 8.2(d) of

Superior Court Rules* (adopted by the Judicial Council) provides: "Each [party] shall complete his . . . requests for admission of . . . the truth of relevant matters of fact under section 2033 of the Code of Civil Procedure, before the pretrial conference. . . ." In the present case there was a pretrial order determining that there was to be no further discovery proceeding. That order of court was determinative of that procedural matter until it was vacated or modified. The trial court did not err in overruling the objection and denying the motion.

██ ██ Appellants Carmichael also contend that the court did not apply the uniform rule for damages in fraud cases, and that there was no evidence to support the amount of the judgment. Section 3343 of the Civil Code provides: "One defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received, together with any additional damage arising from the particular transaction." They argue that there was no evidence as to any amount which represented a difference between the purchase price and the actual value at the time of the purchase. In this connection they refer to the testimony of Mr. Clarke that the value of the lot in December 1956 was $8,500; and to the testimony of Mrs. Shields (the real estate agent), that the property was worth $13,125 at the time of the sale. They assert that Mrs. Shields' testimony was the only testimony as to value as of the date of sale and that since the value stated by her was the same as the purchase price, there was no damage. Mr. Clarke testified that he had been a licensed general building contractor since 1944 and had constructed about 5,500 dwelling houses; that he had built 56 houses in the immediate area of the property involved here; that he had bought and sold property in that area; he has built and sold his own houses in that area; he has ascertained and is familiar with the value of property in that area; in his opinion the house could not be repaired and it should be demolished; it would cost $1,265 to demolish the house; he formed an opinion as to the value of the property involved when he examined it in December 1956; in his opinion the reasonable value of the lot was $8,500. His opinion was admissible in evidence even though he was not a professional appraiser or real estate broker. (See *City of Los Angeles* v. *Frew*, 139 Cal.App.2d 859 [294 P.2d 1073].) The evidence

*Now California Rules of Court, rule 210(d).

was sufficient to justify a finding that the difference in values, as referred to in said code section, was $4,625 (difference between $13,125 and $8,500).

 Appellant McKeever contends there was no contractual or other relationship between him and the plaintiffs. He argues that he was employed by the sellers (through their real estate broker) for the purpose of examining the property to determine whether there were visible infestations; that he was not employed to examine the house for soundness of construction or "infestation *per se*"; that the duty of care required of him in performing the services should be determined from his contract with the plaintiffs; that since there was no privity of contract with respect to plaintiffs, he had no duty of care as to them under the terms of the contract; and that the situation is not one where, as a matter of policy, he should be held liable to persons with whom there is no privity of contract. There was evidence that Mr. McKeever, who was employed by a real estate agent (on behalf of the owners) to make a report, delivered his report to a bank, and at that time he knew that the property was "changing hands" or being sold, but he did not know the names of those who were to be benefited by the report. It could be inferred that he knew that his report was for the benefit or information of persons who were concerned with the purchase and sale transaction involving the property. It could also be inferred that the plaintiffs were of a class of persons for whose benefit the report was made. In Restatement of the Law of Torts, Topic 3, section 552, page 122, it is said: "One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon information if (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and (b) the harm is suffered (i) by the person or one of the class of persons for whose guidance the information is supplied, and (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct. . . ." (See also Prosser on Torts (2d ed.) p. 541.) Plaintiffs were entitled to rely upon the report.

Whether or not appellant McKeever was negligent was a question of fact for the trial court. The evidence was sufficient to support the findings as to negligence on his part. In the conclusions of law, the court stated that the report was

fraudulent in effect in that it was one of the inducing causes for plaintiffs to execute their contract of purchase.

Appellant McKeever also contends that the amount awarded as damages was improper. The total amount awarded was $9,154.51. Of that amount, $4,625 represented the difference between the purchase price and the actual value on the date of sale. The remainder thereof, $4,529.51, was for consequential or additional damages arising from the transaction. The consequential damages consisted of fourteen items, such as amounts paid for: escrow fees, moving to and from the property, building permit, telephone connection, fence, cleaning yard, material for garage, door lock, shrubbery, taxes, rent, and labor. This appellant argues to the effect that damages should not have been awarded against him—that the parties had already made their contract before he was employed; that his function was to examine the property for visible pest infestations; and that he was not to determine whether the house was in sound condition. He argues further that, if it were proper to award damages, the award should be attributable to the misinformation rather than to the existing condition of the house; and that in any event the asserted consequential damages should not have been awarded. Rules relating to the measure of damages in an action involving section 3343 of the Civil Code are stated in *Garrett* v. *Perry,* 53 Cal. 2d 178 [346 P.2d 758]. ▮ It was said therein (p. 186): "It is generally recognized, under both the benefit-of-the-bargain and the out-of-pocket-loss rules, that when, as a result of the fraud, the person defrauded has made expenditures which are reasonable under the circumstances, these may ordinarily be recovered, insofar as they have been lost or rendered fruitless because of the deceit." (See also *Gagne* v. *Bertran,* 43 Cal.2d 481 [275 P.2d 15] relative to rules as to measure of damages.) In the present case it was a question of fact as to whether such alleged consequential damages were damages proximately "arising from the particular transaction." ▮ The evidence was legally sufficient to support award of damages.

The appeal from the order denying the motions for a new trial is dismissed.

The judgment is affirmed.

Fourt, J., and Lillie, J., concurred.

A petition for a rehearing was denied September 24, 1962, and appellants' petition for a hearing by the Supreme Court was denied October 24, 1962.