**UNION OIL COMPANY et al.,**
**Appellants,**

v.

**James J. OPPEN and John J. Masterson et al., Appellees.**

**No. 72-2855.**

United States Court of Appeals,
Ninth Circuit.

June 7, 1974.

Max K. Jamison (argued), Robert K. Wrede, Alfred T. Smith, of McCutchen,

Black, Verleger & Shea, Allyn O. Kreps, Girard E. Boudreau, Jr., Frank G. Ker, Richard H. Zahm, Douglas C. Gregg, George C. Bond, Sam A. Snyder, of O'Melveny & Myers, Walter O. Schell, Richard B. Goethals, Thomas J. Kelley, Jr., Miles W. Newby, Jr., B. J. Roose, of Schell & Delamer, Los Angeles, Cal., for appellants.

James W. McCord (argued), Thomas M. Crehan, of Bodkin, Breslin & Luddy, Los Angeles, Cal., James J. Oppen (argued), Santa Barbara, Cal., Paul L. Tepper, of Moriarity & Tepper, North Hollywood, Cal., Ronald W. Cook, of Price, Postel & Parma, Santa Barbara, Cal., for appellees.

## OPINION

Before ELY and SNEED, Circuit Judges, and SOLOMON,[*] District Judge.

SNEED, Circuit Judge:

This is another case growing out of the Santa Barbara oil spill of 1969. The plaintiffs are commercial fishermen. Each of their complaints alleges that the cause of action has been brought under the provisions of the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. § 1331 et seq.; that the defendants joined in an enterprise, the day-to-day operation of which was within the control and under the management of defendant Union Oil Company, to drill for oil in the waters of the Santa Barbara Channel; that during the period commencing on or about January 28, 1969, vast quantities of raw crude oil were released and subsequently carried by wind, wave and tidal currents over vast stretches of the coastal waters of Southern California; and that as a consequence the plaintiffs have suffered various injuries for which damages are sought. Jurisdiction rests on 28 U.S.C. § 1333 and 43 U.S.C. § 1333(b).

On May 1, 1970, counsel for all parties to this suit entered into a Stipulation which was approved by the district court. This Stipulation, *inter alia,* provided for the consolidation of certain cases, attorneys' fees, the use of special masters, the allocation of authority among counsel for the various plaintiffs with respect to control of any negotiations and the preservation of certain rights on behalf of both plaintiffs and defendants.

For the purposes of the present appeal, however, the most important provisions in this Stipulation are those which deal with the facts and with the extent to which the defendants have agreed to pay the plaintiffs for their damages. The relevant portion of the Stipulation relating to the facts reads as follows:

On or about January 28, 1969, oil began to escape under and near Union Oil Company of California's Platform "A" located on the Outer Continental Shelf of the United States in the Santa Barbara Channel. The undersigned agree that the following is a fair statement of the facts with respect to the Santa Barbara Channel occurrence (hereinafter "occurrence"):

A. Certain operations conducted on Platform "A" resulted in the release of unascertained amounts of crude oil from the ocean floor underneath and near Platform "A".

B. Such crude oil release was carried by natural forces of winds and tides to various areas of the ocean's surface and towards and in some instances to the adjacent coast lines.

C. An unascertained amount of damage has resulted from said occurrence.

Paragraph 3 of the Stipulation, which sets out the defendants' undertaking to pay damages, provides as follows:

In order to provide a basis for the disposition of the above referenced claims it is agreed by the undersigned defendants that they will pay to the above referenced persons and/or

---

[*] Honorable Gus J. Solomon, Senior United States District Judge, District of Oregon, sitting by designation.

plaintiffs who are, or who by reason of subsequent joinder herein become, parties hereto, *all legally compensable damages arising from a legally cognizable injury* caused by the aforementioned occurrence as such damages are determined pursuant to the following provisions; *provided however, that the payment assumed hereby will not exceed such amount and such claim as said defendants or their contractors would be responsiblue for in the case of negligence.* Payment of said damages persuant hereto shall operate as an assignment of said claims to said defendants. No claim for punitive or exemplary damages shall be asserted and no such damages shall be awarded. (emphasis added).

In May of 1972, the defendants moved for partial summary judgment before the special masters to strike from plaintiffs' prayers "that item of damage usually denominated as 'ecological damage'." More specifically, the defendants sought to eliminate from the prayers any element of damages consisting of profits lost as a result of the reduction in the commercial fishing potential of the Santa Barbara Channel which may have been caused by the occurrence. According to the defendants, such long-term ecological damage is not compensable under the law and thus is not within their undertaking as set forth in the Stipulation.

The motion was denied by the special masters in a brief order which recognized that injuries resulting from "an interference by defendants with [plaintiffs'] economic right to fish in public waters" were legally compensable. The defendants then went into district court to object to this order, and again moved for a partial summary judgment.

Once more the motion was denied. In his order the district judge first observed that paragraph 3 of the Stipulation, although carefully phrased, had the practical effect of a confession of liability for tort negligence. Continuing, the judge accepted the defendants' statement of the issue, *viz*:

Does the alleged diminution of the aquatic life of the Santa Barbara Channel claimed to have resulted from the occurrence constitute a legally compensable injury to the Commercial Fishermen claimants?

The district judge then went on to hold that such a question must be answered in the affirmative. This result, he pointed out, is in no way dependent on whether the plaintiffs have a proprietary interest in, or ownership of, the sea life in the Santa Barbara Channel. As the district judge saw it, "the loss of a prospective economic advantage occasioned by the alleged diminishment of the quantities of available sea life formed a sufficient basis for the recovery under the law of negligence."

The district judge certified the order as a proper subject for an interlocutory appeal, and the defendants petitioned this Court for leave to appeal under 28 U.S.C. § 1292(b). The petition was granted, and the issue now before us is whether the district court properly denied the defendants' motion. We hold that the district court properly interpreted paragraph 3 of the Stipulation, and that its action in denying the defendants' motion was proper.

I.

The Applicable Law

Determination of the proper law by which the defendants' motion for partial summary judgment is to be judged turns out to be analytically complex but less significant functionally than one would have imagined. As the plaintiffs assert in their complaints, these cases are brought under the Outer Continental Shelf Lands Act ("Lands Act"), 43 U.S.C. § 1331 et seq. Pursuant to Section 1333(a)(1) of this Act, federal law is made applicable "to the subsoil and seabed of the Outer Continental Shelf and to all artificial islands and fixed structures which may be erected thereon. . . ." However, as the Supreme Court has pointed out in Rodrigue v. Aetna Casualty Company, 395

U.S. 352, 365, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), state law is adopted as a surrogate for federal law under the Act to the extent that such state law is "applicable and not inconsistent with . . . other Federal laws." *See* 43 U.S.C. § 1333(a)(2). Thus, when applied in the context of the Act, state law becomes federal law federally enforced. 395 U.S. at 365, 89 S.Ct. 1835.

It is apparent from the briefs of the parties that their analysis did not advance beyond the point of concluding that, since there appeared to be no inconsistent federal law, the law of California was controlling. However, this Court's opinion in Oppen v. Aetna Insurance Company, 485 F.2d 252 (9th Cir., 1973), makes clear that the parties' analysis is not necessarily determinative of the issue before us. There remains yet a third possibility—i. e. that admiralty law is exclusively applicable to the present controversy. As was said in *Aetna Insurance*, the Lands Act does not eliminate this possibility.

The Supreme Court in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), has instructed us that the determination of whether the admiralty jurisdiction of the federal courts embraces a tortious act depends, not only on the place of the tort, but also on whether the wrong bears a significant relationship to a traditional maritime activity. *Id.* at 268, 93 S.Ct. 493. Acting on this instruction, this Court in *Aetna Insurance* held that an injury to maritime vessels and an interference with their right of navigation, resulting from the same oil spill which is involved here, constituted a maritime tort cognizable in admiralty. In so holding, it was recog-

nized that the "activity" whose relationship to traditional maritime activity was to be examined was that of the injured party, not that of the tortfeasor. For this reason, the fact that drilling for oil from fixed platforms located over the outer Continental Shelf is not in itself a traditional maritime activity was held not to constitute a basis for refusing to classify the wrong as a maritime tort.

It follows that in order to determine the applicability of admiralty law to the facts of this case, it is necessary to inquire whether a reduction in plaintiffs' anticipated profits, caused by what for present purposes we must assume to be the negligent conduct of the defendants, bears a significant relationship to traditional maritime activity. Were it necessary for this issue to be decided to dispose of this case, our inclination would be to hold that such a relationship does exist. In numerous ways, the fishing industry is clearly a part of traditional maritime activity; and to assert otherwise would amount to a repudiation of much of maritime history. For example, fishermen have been treated as seamen for purposes of enforcing their rights against the fishing vessel and its owner; *see e. g.*, Old Point Fish Company v. Haywood, 109 F.2d 703 (4th Cir., 1940); The Z R–3, 18 F.2d 122 (W.D. Wash.1927). *See also* 46 U.S.C. §§ 531–534; Gilmore and Black, The Law of Admiralty 257 (1957) (hereinafter cited as Gilmore and Black); Robinson, Admiralty 281 (1939);[1] and the vessels themselves have been the object of federal legislation designed to afford their owners many of the benefits which the law otherwise provides to maritime vessels generally. *See, e. g.*, 46 U.S.C. § 922 (The Ship Mortgage Act).[2]

---

1. The practice of "working on a lay"— i. e. sharing the proceeds of a catch—does cause the rights of fishermen to be distinguishable in certain respects from those of other seamen, who generally work for wages. One example of this would be the vulnerability of the lay to maritime liens of suppliers. *See* Gilmore and Black at 558 n. 209. However, these differences, in our view, are not sufficient to remove the activi-

ties of such fishermen from traditional maritime activity.

2. The purpose of the Act was to promote private investment in shipping as well as to protect the United States, which was the principal source of credit in the post-World War I period. *See generally* Gilmore and Black at 568–92. *See also* Canfield, The Ship Mortgage Act of 1920, 22 Mich.L.Rev.

Our preference for maritime law as the law by which the defendants' motion for partial summary judgment is to be measured is strengthened when Section 1333(a)(2) of the Lands Act is closely examined. The use of state law as a surrogate for federal law is limited to "that portion of the *subsoil* and *seabed* of the outer Continental Shelf, and *artificial islands* and *fixed structures* erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . ." (emphasis added). 43 U.S.C. § 1333(a)(2). The sea, as such, is not mentioned in the Act; nor in our view was it intended to be. Quite understandably state law, which can intrude only to a limited extent in matters traditionally subject to admiralty jurisdiction, *see* Askew v. American Waterways Operators, Inc., 411 U.S. 325, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973); Skiriotes v. Florida, 313 U.S. 69, 76–77, 61 S.Ct. 924, 85 L.Ed. 1193 (1941); Manchester v. Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159 (1891), was not intended to embrace traditional maritime activity.

As the Supreme Court in Rodrigue v. Aetna Casualty Company, *supra,* has indicated, in enacting the Lands Act Congress chose to treat drilling platforms as artificial islands rather than as ships subject to admiralty jurisdiction in order to afford the workers on such islands the protections to which they would otherwise be entitled by reason of their citizenship in the adjacent states —subject, of course, to federal enforcement and the power of the federal government to make inconsistent laws and regulations. However, in order to serve this purpose, it is not necessary for us to read the Act as requiring that state law be treated as federal law for purposes of determining the consequences of torts which occur in and on the sea,

and which have the required nexus with traditional maritime activity. Thus, it would appear that an injury which occurs *in* the sea, as is the case here, should not be held to be properly cognizable under the provisions of the Lands Act.

We are, however, not driven to the choice between maritime law and the law of California. So far as our research reveals, neither forum has made a definitive ruling on the precise issue before us. As a consequence, it has become necessary for us to examine a fairly large body of authorities, drawn from numerous jurisdictions and secondary sources, in order to reach what we regard as the proper resolution of this dispute. In that the same authorities and sources must be examined and evaluated without regard to whether this process is characterized as an examination of admiralty law or the law of California, we are convinced that under either body of law the actions of the special masters and the district judge in denying the defendants' motion for partial summary judgment were correct.

Moreover, maritime law itself frequently looks to both the statutory and decisional law of the states for sources from which to fashion its principles. *See* Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed. 2d 339 (1970) (new maritime cause of action for wrongful death to be implemented by reference to other federal law and state statutory and decisional law); Shutler, Pollution of the Sea By Oil, 7 Houston L.Rev. 415, 434 (1970); Comment, Oil Pollution of the Sea, 10 Harv.Int.L.J. 316, 347 (1969). Although in some instances this derivative assistance may entail the application of state law principles, unlike our diversity jurisdiction there is no requirement—albeit some scholars have suggested such a course for certain areas in admiralty—

10 (1923). Prior to 1935, the coverage of the Ship Mortgage Act, 46 U.S.C. § 911 et seq. was such that its coverage excluded "practically the entire commercial fishing fleet." Gilmore and Black *supra* at 575. As

amended, however, it permitted the inclusion of fishing vessels subject to certain general limitations. Act of June 27, 1935, C. 319, 49 Stat. 424; 46 U.S.C. § 922.

that state law be adopted. *See* Robertson, Admiralty and Federalism 194–201 (1970) and the authorities cited therein.

In any event, we shall proceed in a manner that we believe is faithful to the spirit of California tort law in disposing of the issue before us. For this reason we are content to say that for purposes of this case we regard it as irrelevant whether our efforts are designated as an exposition of admiralty law or the law of California.

## II.

### Recovery for Pure Economic Loss in Negligence: The General Rule.

Defendants support their motion for partial summary judgment by pointing to the widely recognized principle that no cause of action lies against a defendant whose negligence prevents the plaintiff from obtaining a prospective pecuniary advantage. *See, e. g.*, Prosser, Law of Torts 952 (4th ed. 1971) (hereinafter Prosser); Harvey, Economic Losses and Negligence, 50 Can.Bar Rev. 580 (1972); Note, 49 Can.Bar Rev. 619 (1971); Note, Negligence and Economic Loss, 117 The Solicitors' Jour. 255 (1971); Note, Negligent Interference with Economic Expectancy: The Case for Recovery, 16 Stan.L.Rev. 664 (1964). *See also* Restatement (Second) of Torts, Tent.Draft No. 14, § 766B. As the defendants see it, any diminution of the sea life in the Santa Barbara Channel caused by the occurence, which, it must be remembered, is attributable to the defendants' negligence by reason of the parties' Stipulation, consists of no more

than the loss of an economic advantage which is not a "legally cognizable injury" and thus not "legally compensable."[3]

Their argument has strength. It rests upon the proposition that a contrary rule, which would allow compensation for all losses of economic advantages caused by defendant's negligence, would subject the defendant to claims based upon remote and speculative injuries which he could not foresee in any practical sense of the term. Accordingly, in some cases it has been stated as the general rule that the negligent defendant owes no duty to plaintiffs seeking compensation for such injuries.[4] In other of the cases, the courts have invoked the doctrine of proximate cause to reach the same result;[5] and in yet a third class of cases the "remoteness" of the economic loss is relied upon directly to deny recovery.[6] The consequence of these cases is that a defendant is normally relieved of the burden to defend against such claims, and the courts of a class of cases the resolution of which is particularly difficult.

The general rule has been applied in a wide variety of situations. Thus, the negligent destruction of a bridge connecting the mainland with an island, which caused a loss of business to the plaintiff who was a merchant on the island, has been held not to be actionable. Rickards v. Sun Oil Company, 41 A.2d 267, 23 N.J.Misc. 89 (1945). A plaintiff engaged in commercial printing has been held unable to recover against a negligent contractor who, while engaged in excavation pursuant to a contract with a

3. We decline to reach the issue of whether defendants' oil drilling operations constitute an "ultrahazardous activity" and express no opinion as to the applicability of this doctrine to the facts presently before us.

4. *See, e. g.*, The Federal No. 2, 21 F.2d 313 (2d Cir., 1927); Chelsea Moving & Trucking Co. v. Ross Towboat Co., 280 Mass. 282, 182 N.E. 477 (1932); Byrd v. English, 117 Ga. 191, 43 S.E. 419 (1903); Brink v. Wabash R. R., 160 Mo. 87, 60 S.W. 1058 (1901); Attorney General for New South Wales v. Perpetual Trustee Co., 85 Commw.L.R. 237, 286 (K.B.1951) (Austr.).

5. *See, e. g.*, The Federal 2, *supra* note 4; Chelsea Moving & Trucking Co. v. Ross Towboat Co., *supra* note 4; Byrd v. English, *supra* note 4; La Societe Anonyme de Remorguage a Helice v. Bennetts [1911] 1 K. B. 243 (1910); Cattle v. Stockton Waterworks Co., L.R. 10 Q.B. 453 (1875).

6. *See, e. g.*, Northern States Contracting Co. v. Oakes, 191 Minn. 88, 253 N.W. 371 (1934). For a discussion of this area, see particularly Note, Negligent Interference with Economic Expectancy: The Case for Recovery, *supra* at 674–75.

third party, cut the power line upon which the plaintiff's presses depended. Byrd v. English, 117 Ga. 191, 43 S.E. 419 (1903); *contra*, J. W. Moore (North Shields) Ltd. v. Sharp, 108 Sol.J. 453 (1964). *But see* S. C. M. (U. K.) v. W. J. Whittall & Sons, Ld., [1970] 3 All E. R. 245; Seaway Hotels Ltd. v. Gragg, [1959] Ont. 177, 17 D.L.R.2d 292 (High Ct.), aff'd [1959] Ont. 581, 21 D.L.R.2d 264 (Ct.App.1960). A defendant who negligently injures a third person entitled to life-care medical services by the plaintiff is liable to the third person but not to the plaintiff. Fifield Manor v. Finston, 54 Cal.2d 632, 7 Cal.Rptr 377, 354 P.2d 1073 (1960) (subrogation also denied because third party's claim not assignable). The operators of a dry dock are not liable in admiralty to charterers of a ship, placed by its owners in the dry dock, for negligent injury to the ship's propeller where the injury deprived the charterer of the use of the ship. Robins Dry Dock & Repair Company v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). Mr. Justice Holmes, in writing this opinion, observed that ". . . a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong." 275 U.S. at 309, 48 S.Ct. at 135.

The citation of cases applying the general rule could be extended, but this abridged collection is sufficient to emphasize the point that it operates in a wide variety of settings. For purposes of our analysis, however, one further setting in which the rule has been applied requires mention—that being the area of the law dealing with products liability. In this area, the issue is usually couched in terms of whether a purchaser can recover in tort from a negligent manufacturer, with whom the purchaser is not in privity, for economic losses caused by the failure of the purchased article to perform in accordance with the purchaser's reasonable expectations. Defendants in the present action rely heavily on California cases which indicate that no such recovery is possible.

In Seely v. White Motor Company, 63 Cal.2d 9, 45 Cal.Rptr. 17, 403 P.2d 145 (1965), for example, the plaintiff, who had purchased a truck for use in his business, sought to recover from the manufacturer damages representing both the cost of repairs and lost profits attributable to defects in the performance of the truck as well as that portion of the purchase price which he had previously paid. The manufacturer had expressly warranted the truck "to be free from defects in material and workmanship under normal use and service" and had limited its liability thereunder "to making good at its factory any part or parts thereof. . . ." The trial court permitted a recovery of the lost profits and the previously paid portion of the purchase price, but denied recovery for the cost of repairs. On appeal, the manufacturer contended that the damage award allowed by the trial court had exceeded that permissible under the theory of strict liability in tort, which theory had superseded the law of warranty in California by reason of Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal.Rtpr. 697, 377 P.2d 897 (1962).[7]

The Supreme Court of California held that the abandonment of warranty did

7. In *Greenman*, the California Supreme Court held that a consumer, not in privity with the manufacturer of a defective product, could not recover under a theory based on breach of warranty for personal injuries which he had sustained as a result of the product's malfunction. In its opinion, the court indicated that such damages were cognizable under strict liability in tort, and in doing so stated that: ·

. . . rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to govern the manufacturer's liability to those injured by their defective products unless those rules also serve the purposes for which such liability is imposed.
59 Cal.2d at 63, 27 Cal.Rptr. at 701, 377 P.2d at 901.

not extend to the commerical aspects of a transaction. As to those aspects, it was held that recovery must be based on the principles of warranty law and not on strict liability in tort. Inasmuch as the defendant in *Seely* had warranted that the truck was "free from defects in material and workmanship under normal use and service," the damages allowed by the trial court were held to have been proper. This was true, observed the court, even though they would not have been had the doctrine of strict liability in tort been applicable. The court's observation was bolstered by dictum, upon which the defendants in this case place great reliance, which stated that under California law pure economic losses are not recoverable in an action based on negligence. The dictum consists of the following statement:

> A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. . . . *Even in actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.*

63 Cal.2d at 18, 45 Cal.Rptr. at 23, 403 P.2d at 151. (emphasis added).

Two things should be said concerning the court's reference to the scope of liability in negligence. The first is that it must be understood as having been made in the context of an unavoidable undertaking to fix the spheres in the field of products liability within which warranties and strict liability were to operate. Too much should not be made of a restraint imposed on the scope of liability for negligence when it has been developed for the purpose of preserving an area within which warranties can

function.[8] The second is that this restraint has been cogently criticized as being unnecessary to an appropriate accommodation of warranty and tort liability. *See* Franklin, When Worlds Collide: Liability Theories and Disclaimers in Defective Product Cases, 18 Stan.L. Rev. 974, 1002–03 (1966). The recovery of economic losses sustained by an ultimate consumer, even absent privity with a negligent manufacturer, may or may not be desirable; but its allowance, in any event, would not make warranty principles redundant.

### III.

Some Exceptions to the General Rule.

Doubt concerning the scope of *Seely* dictum is strengthened when the numerous exceptions or qualifications to the general rule are considered.

Prosser recognizes that a recovery for pure economic losses in negligence has been permitted in instances in which there exists "some special relation between the parties." Prosser at 952. The failure of the plaintiff to obtain a contract because of a telegraph company's negligent transmission of a message has been held to be legally cognizable, and is cited as an example of the "special relationship" qualification. *Id.*, at 952, n. 79. *See also* McQuilkin v. Postal Telegraph Cable Company, 27 Cal.App. 698, 151 P. 21 (1915) (injury from lost advantageous contract must not be remote and uncertain). Other examples which have been cited are the negligent failure to perform a gratuitous promise to obtain insurance, and the negligent delay in acting upon an application for insurance. *See* Prosser, at 952, n. 80, 81.

A more recent development in California law involves the right to recover, ab-

---

8. The dictum of the California Supreme Court in *Seely*, quoted above, has been applied by this Court to deny recovery in the products liability setting where the plaintiff has brought an action in negligence rather than under a theory of strict liability. *See* Bright v. Goodyear Tire & Rubber Co., 463 F.2d 240 (9 Cir. 1972). While our opinion

does contain language sufficiently broad to suggest that the *Seely* distinction between warranty and tort recovery may be applicable beyond this setting, we are of the view that such a reading unduly expands our decision in that case. For the reasons outlined in the text, we therefore decline to so apply it.

sent privity, from a defendant whose negligent failure to obtain a proper attestation of the will of a third party has deprived the plaintiff of a bequest which had been granted in the improperly attested will. Biakanja v. Irving, 49 Cal.2d 647, 320 P.2d 16 (1958). On appeal to the Supreme Court of California, the plaintiff's pure economic loss was held to be a legally cognizable injury, a position which has been subsequently reaffirmed in Lucas v. Hamm, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685 (1961) (recovery denied because of the absence of negligence).

The approach adopted by the California Supreme Court in *Biakanja* is particularly instructive. After stating that the question before it was "whether defendant was under a duty to exercise due care to protect plaintiff from injury and was liable for damages caused plaintiff by his negligence even though they were not in privity of contract," the court stated:

> The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.

49 Cal.2d at 650, 320 P.2d at 19 (1958). It is thus obvious that California does not blindly follow the general rule upon which the defendants here rely.

It is but a short step from these two California cases to a body of law existing both in this country and in the British Commonwealth in which defendants engaged in certain professions, businesses, or trades have been held liable for economic losses resulting from the negligent performance of tasks within the course of their callings. One Commonwealth scholar has stated that "in a proper case a person may recover economic loss caused by the negligence of persons such as bankers, commission agents, real estate agents, accountants, surveyors, valuers, analysts, insurance brokers, stock brokers, government employees, doctors, architects, car salesmen who undertake to have cars insured, car testers, and drawers of cheques." Harvey, Economic Losses and Negligence, 50 Can.Bar Rev. 580, 603–04 (1972). *See also*, Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] A. C. 465.

The American cases reflect a similar development. There are numerous cases indicating that economic losses may be recovered for the negligence of pension consultants, accountants, architects, attorneys, notaries public, test hole drillers, title abstractors, termite inspectors, soil engineers, surveyors, real estate brokers, drawers of checks, directors of corporations, trustees, bailees and public weighers.[9]

9. Gediman v. Anheuser Busch, Inc., 299 F.2d 537 (2nd Cir., 1962) (pension consultant); Rusch Factors, Inc. v. Levin, 284 F.Supp. 85 (D.C.R.I.1968) (accountant); United States v. Rogers & Rogers, 161 F.Supp. 132 (S.D. Cal.1958) (architect); Lucas v. Hamm, 56 Cal.2d 583, 15 Cal.Rptr. 821, 364 P.2d 685, cert. denied, 368 U.S. 987, 82 S.Ct. 603, 7 L.Ed.2d 525 (1962) (attorney); Biakanja v. Irving, 49 Cal.2d 647, 320 P.2d 16 (1958) (notary public); Gagne v. Bertran, 43 Cal. 2d 481, 275 P.2d 15 (1954) (test hole driller); Northwestern Title Ins. Co. v. Flack, 6 Cal.App.3d 134, 85 Cal.Rptr. 693 (1970) (title abstractor); Viotti v. Giomi, 230 Cal. App.2d 730, 41 Cal.Rptr. 345 (1964) (title abstractor); Hardy v. Carmichael, 207 Cal. App.2d 218, 24 Cal.Rptr. 475 (1962) (termite inspector); M. Miller Co. v. Central Contra Costa Sanitary Dist., 198 Cal.App.2d 305, 18 Cal.Rptr. 13 (1961) (soil engineer); Roberts v. Karr, 178 Cal.App.2d 535, 3 Cal. Rptr. 98 (1960) (surveyor); Granberg v. Turnham, 166 Cal.App.2d 390, 333 P.2d 423 (1958) (real estate broker); Hawkins v. Oakland Title Ins. & Guar. Co., 165 Cal. App.2d 116, 331 P.2d 742 (1958) (title abstractor); Park State Bank v. Arena Auto Auction, Inc., 59 Ill.App.2d 235, 207 N.E.2d 158 (1965) (drawer of check); Ryan v.

Recovery for pure economic loss legally attributable to the defendant's negligence has also been recognized in traditional maritime settings. Thus, fishermen in Scotland who worked under a profit-sharing arrangement with the owner of a trawler damaged by the defendant's negligence have been permitted to recover their portion of the anticipated profits of the fishing venture even though they suffered no physical injury. Main v. Leask [1910] S.C. 771 (Ct. of Session). More important, however, is the fact that this Circuit has reached precisely the same conclusion in an admiralty proceeding. Carbone v. Ursich, The Del Rio, 209 F.2d 178 (9th Cir., 1953). In so doing, we refused to apply the teaching of Robins Dry Dock and Repair Company v. Flint, *supra,* to the situation with which the fishermen were confronted, and observed:

> This long recognized rule [the right of fishermen to recover their share of the prospective catch] is no doubt a manifestation of the familar principle that seamen are the favorites of admiralty and their economic interests entitled to the fullest possible legal protection. These considerations have given rise to a special right comparable to that of a master to sue for the loss of services of his servant, or the right of a husband or father to sue for the loss of services of wife or child.

209 F.2d at 182.

Another instance in which a claim for economic loss, unaccompanied by any physical injury to the person or property of the claimant, has been recognized under admiralty law is illustrated by Aktieselskabet Cuzco v. The Sucarseco, 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942 (1935). The issue before the Court in that case was whether the owners of cargo, shipped on a vessel which ultimately collided with defendant's vessel, could recover for their general average contribution when both vessels were at fault and both were damaged. The Supreme Court held in the affirmative. Although the cargo was physically damaged by the collision, this fact appears to have had no bearing on the Court's resolution of the issue. Rather, the Court recognized that the right of the cargo owners to have their general average contribution restored sprang directly from the tort and was in no sense derivative or parasitically dependent upon the presence of a physical injury.

The right to recover for economic losses which are parasitic to an injury occurring to person or property is not questioned. See e. g., Reynolds v. Bank of American National Trust and Savings Association, 53 Cal.2d 49, 345 P.2d 926 (1959) (loss of use of airplane destroyed by defendant's negligence held to be recoverable). Furthermore, this is the case even though frequently the magnitude of the economic loss so far overshadows that of the physical injury as to warrant the assertion that the general rule, barring recovery absent a physical injury, is but a formalism. See Harvey, *supra* at 585, 594–95.

This much abridged catalogue of exceptions and qualifications to the general rule can be brought to a close for purposes of our analysis by calling attention to several cases in which pollution of a stream has enabled one whose business is injured thereby to recover his lost profits. For example, in Fort Worth & Rio Grande Railway Company v. Hancock, 286 S.W. 335 (Tex.Civ.App.1926) the plaintiff, who operated a swimming pool in the channel of a river, was per-

Kanne, 170 N.W.2d 395 (Iowa 1969) (accountant); Shatterproof Glass Corp. v. James, 466 S.W.2d 873, 46 A.L.R.3d 968 (Tex.Civ.App.1971) (accountant); Durham v. Wichita Mill & Elevator Co., 202 S.W. 138 (Tex.Civ.App.1918) (director of corporation); Doyle v. Chatham & Phenix Nat'l Bank, 253 N.Y. 369, 171 N.E. 574 (1930) (trustee); New York Int'l Products Co. v. Erie R. R., 244 N.Y. 331, 155 N.E. 662 (1927) (bailee); Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922) (public weigher). See, generally Freeman, Opinion Letters and Professionalism, 1973 Duke L.J. 371 (1973).

mitted to recover lost profits which had resulted from the defendant's negligent pollution of the river. Similarly, downstream riparian owners, engaged in operating a business dependent upon fishing, have been permitted to recover for the injury to their business caused by the pollution of the stream. *See* Masonite Corporation v. Steede, 198 Miss. 530, 547, 23 So.2d 756 (1945); Hampton v. North Carolina Pulp Company, 223 N.C. 535, 27 S.E.2d 538 (1943). It should be noted that in each of these cases the plaintiff was a riparian owner, and in the latter two there was no indication that the defendant's conduct was merely negligent and not intentional. However, in neither *Masonite* nor *Hampton* does there appear any recognition that mere negligence would have absolved the defendants. Both assumed the existence of a nuisance which could well have rested upon the defendants' negligent conduct. *See* Prosser at 575.

Moreover, the plaintiffs' status as riparians does not make improper the classification of these cases as exceptions to, or qualifications of, the general rule which is relied upon by the defendants in the present action. The injury for which damages were sought in each case was the loss of anticipated profits —a pure economic loss as that term is normally understood. To permit riparianship to transmute this loss into an ordinary property loss for the purpose of allowing recovery does no harm. However, harm would be done if the fact that the plaintiffs in this case are not riparian owners was held to deprive them of the comfort these authorities provide.

## IV.

### The Instant Action.

It is thus apparent that we are not forclosed by precedent from examining on its merits the issue presented by the defendants' motion for partial summary judgment. As we see it, the issue is whether the defendants owed a duty to the plaintiffs, commercial fishermen, to refrain from negligent conduct in their drilling operations, which conduct reasonably and foreseeably could have been anticipated to cause a diminution of the aquatic life in the Santa Barbara Channel area and thus cause injury to the plaintiffs' business.

In finding that such a duty exists, we are influenced by the manner in which the Supreme Court of California has approached the duty issue in tort law. In holding that the mother of a child, killed by the defendant's negligent operation of an automobile, could recover for emotional disturbance and shock even though she was not within the zone of physical impact, the court in Dillon v. Legg, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968) stated that:

> Defendant owes a duty, in the sense of a potential liability for damages, only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous, and hence negligent, in the first instance. (See Keeton, Legal Cause in the Law of Torts (1963) 18–20; Seavey, Mr. Justice Cardozo and the Law of Torts (1939) 52 Harv.L.Rev. 372; Seavey, Principles of Torts (1942) 56 Harv.L. Rev. 72.)

> Harper and James state the prevailing view. The obligation turns on whether 'the offending conduct foreseeably involved unreasonably great risk of harm to the interests of someone other than the actor. . . . [T]he obligation to refrain from . . . particular conduct is owed only to those who are foreseeably endangered by the conduct and only with respect to those risks or hazards whose likelihood made the conduct unreasonably dangerous. Duty, in other words, is measured by the scope of the risk which negligent conduct foreseeably entails.' (2 Harper & James, The Law of Torts, *supra*, at p. 1018; fns. omitted.)

> \* \* \* \* \* \*

Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the fore-

seeability of the risk, that factor will be of prime concern in every case. Because it is inherently intertwined with foreseeability such duty or obligation must necessarily be adjudicated only upon a case-by-case basis.

68 Cal.2d at 739–740, 69 Cal.Rptr. at 79, 441 P.2d at 919–920.

While it is true that the earlier decision of the California Supreme Court in *Biakanja* does not accord "foreseeability of the risk" the commanding position which it was afforded in Dillon v. Legg, we can not escape the conclusion that under California law the presence of a duty on the part of the defendants in this case would turn substantially on foreseeability. That being the crucial determinant, the question must be asked whether the defendants could reasonably have foreseen that negligently conducted drilling operations might diminish aquatic life and thus injure the business of commercial fishermen. We believe the answer is yes. The dangers of pollution were and are known even by school children. The defendants understood the risks of their business and should reasonably have foreseen the scope of its responsibilities. To assert that the defendants were unable to foresee that negligent conduct resulting in a substantial oil spill could diminish aquatic life and thus injure the plaintiffs is to suppose a degree of general ignorance of the effects of oil pollution not in accord with good sense.

An examination of the other factors mentioned in *Biakanja* only strengthens our conclusion that the defendants in this case owed a duty to the plaintiffs. Thus, the fact that the injury flows directly from the action of escaping oil on the life in the sea, Askew v. American Waterways Operators, Inc., 411 U.S. at 333 n. 5, 93 S.Ct. 1590, the public's deep disapproval of injuries to the environment and the strong policy of preventing such injuries, all point to existence of a required duty.

The same conclusion is reached when the issue before us is approached from the standpoint of economics. Recently a number of scholars have suggested that liability for losses occasioned by torts should be apportioned in a manner that will best contribute to the achievement of an optimum allocation of resources. *See* e. g., Calabresi, The Cost of Accidents, 69–73 (1970) (hereinafter Calabresi); Coase, The Problem of Social Cost, 3 J. Law & Econ. 1 (1960). This optimum, in theory, would be that which would be achieved by a perfect market system. In determining whether the cost of an accident should be borne by the injured party or be shifted, in whole or in part, this approach requires the court to fix the identity of the party who can avoid the costs most cheaply. Once fixed, this determination then controls liability.

It turns out, however, that fixing the identity of the best or cheapest cost-avoider is more difficult than might be imagined. In order to facilitate this determination, Calabresi suggests several helpful guidelines. The first of these would require a rough calculation designed to exclude as potential cost-avoiders those groups/activities which could avoid accident costs only at an extremely high expense. Calabresi at 140–43. While not easy to apply in any concrete sense, this guideline does suggest that the imposition of oil spill costs directly upon such groups as the consumers of staple groceries is not a sensible solution. Under this guideline, potential liability becomes resolved into a choice between, on an ultimate level, the consumers of fish and those of products derived from the defendants' total operations.

To refine this choice, Calabresi goes on to provide additional guidelines which, in this instance, have proven none too helpful. For example, he suggests an evaluation of the administrative costs which each party would be forced to bear in order to avoid the accident costs. Calabresi at 143–44. He also states that an attempt should be made to avoid an allocation which will impose some costs on those groups or activities which neither consume fish nor utilize those products of the defendants derived from their operations in the Santa Bar-

bara Channel. Calabresi at 144–50. On the record before us, we have no way of evaluating the relative administrative costs involved. However, we do recognize that it is probable that by imposing liability on the defendants some portion of the accident costs in this case may be borne by those who neither eat fish nor use the petroleum products derived from the defendants' operations in Santa Barbara.

Calabresi's final guideline, however, unmistakably points to the defendants as the best cost-avoider. Under this guideline, the loss should be allocated to that party who can best correct any error in allocation, if such there be, by acquiring the activity to which the party has been made liable. Calabresi at 150–52. The capacity "to buy out" the plaintiffs if the burden is too great is, in essence, the real focus of Calabresi's approach. On this basis there is no contest—the defendants' capacity is superior.

Our holding that the defendants are under a duty to commercial fisherman to conduct their drilling and production in a reasonably prudent manner so as to avoid the negligent diminution of aquatic life is not foreclosed by the fact that the defendants' negligence could constitute a public nuisance under California law. Contrary to the situation that existed in Oppen v. Aetna Insurance Company, *supra*, in which we held that an interference with the public's right of navigation in the navigable waters of California did not vest a private cause of action in those who lost the use of their private pleasure craft, in the case now before us the plaintiffs assert an injury to their commercial enterprises, not to their "occasional Sunday piscatorial pleasure." *Id.* at 260. The right of commercial fishermen to recover for injuries to their businesses caused by pollution of public waters has been recognized on numerous occasions. *See* Masonite Corporation v. Steede, *supra*; Hampton v. North Carolina Pulp Company, *supra*; Prosser, Private Action for Public Nuisance, 52 Va.L.Rev. 997, 1013–16 (1966). The injury here asserted by the plaintiff is a pecuniary loss of a particular and special nature, limited to the class of commercial fishermen which they represent.

This injury must, of course, be established in the proceedings that will follow this appeal. To do this it must be shown that the oil spill did in fact diminish aquatic life, and that this diminution reduced the profits the plaintiffs would have realized from their commercial fishing in the absence of the spill. This reduction of profits must be established with certainty and must not be remote, speculative or conjectural. *See* McCormick, Damages, 97–101 (1935). These are not small burdens, nor can they be eased by our abhorrence of massive oil spills. All that we do here is to permit the plaintiffs to attempt to prove their case, and to reject the idea urged upon us by the defendants that a barrier to such an effort exists in the form of the rule that negligent interference with an economic advantage is not actionable.

Finally, it must be understood that our holding in this case does not open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were discommoded by the oil spill of January 28, 1969. The general rule urged upon us by defendants has a legitimate sphere within which to operate. Nothing said in this opinion is intended to suggest, for example, that every decline in the general commercial activity of every business in the Santa Barbara area following the occurrences of 1969 constitutes a legally cognizable injury for which the defendants may be responsible. The plaintiffs in the present action lawfully and directly make use of a resource of the sea, *viz.* its fish, in the ordinary course of their business. This type of use is entitled to protection from negligent conduct by the defendants in their drilling operations. Both the plaintiffs and defendants conduct their business operations away from land and in, on and under the sea. Both must carry on their commercial enterprises in a reasonably prudent manner. Neither

should be permitted negligently to inflict commercial injury on the other. We decide no more than this.

Affirmed.

ELY, Circuit Judge (concurring):

I concur in the result. Since, however, the written briefs filed by the parties contain no discussion of admiralty law, I conclude that all of the parties believed that, under their stipulation, the controversy would be resolved by application of California's law relating to torts. I therefore disassociate myself from that portion of my Brother Sneed's opinion which deals with the law of admiralty. I view those comments as constituting dictum unnecessary to our disposition of the appeal.