### MADDOX v. INTERNATIONAL PAPER CO.

Civ. A. 2399.

United States District Court
W. D. Louisiana, Shreveport Division.

July 18, 1951.

R. H. Lee, Benton, La., for plaintiff.

George T. Madison, Bastrop, La., and John H. Tucker, Jr., Shreveport, La., for defendant.

PORTERIE, District Judge.

These parties have been before us in the same matter. We reaffirm all we said in the first case. Maddox v. International Paper Company, D.C., 47 F.Supp. 829. We particularly reaffirm the principles of law of that case, as they are distinctly applicable to the instant case.

Following the judgment of $6,000 given the plaintiff for three years (October, 1939 to October, 1942) of damages to his private and commercial fishing business in the first case, the parties entered into a "compromise agreement and settlement", dated February 8, 1943. The defendant company paid plaintiff under this agreement the sum of $9,000, the $6,000 judgment and $3,000 additional.

"[I]n accepting same the said Ernest Maddox fully acquits and releases the said International Paper Company from said judgment aforesaid, and from all damages accruing by virtue of the pollution of Bodcaw Bayou up to and including the present time, and fully acquits and releases said Corporation from any damages that might hereafter arise up to and including December 31, 1946. And as a further consideration the said Ernest Maddox binds and obligates himself to fully cooperate with the defendant corporation, and to keep it informed as to the water level, flood condition, and water condition in and near his property."

The two other main paragraphs in this agreement provide:

"Whereas, it is the desire of plaintiff and defendant in said suit to compromise, settle, and adjust said judgment, as well as all differences arising out of the pollution of Bodcaw Bayou, Bossier Parish, Louisiana, and to fully acquit the defendant, not only from this judgment, but all damages or rights of action accruing up to this date, or that might accrue between this date and December 31, 1946, and a mutual understanding have thereof.

"In addition thereto the said Ernest Maddox grants to the said Corporation full flowage rights across any and all property that he owns, real and personal, near said Bodcaw Bayou, with full acquittance and release of any damages caused thereby up to and including December 31, 1946."

Then the instant suit was filed on May 19, 1948. Granting that prescription may not be pleaded for any item of damages within the year before its filing, we then have to conclude that the instant suit is good for all damages from May 19, 1947. But the compromise agreement settled for everything up to January 1, 1947; therefore, the plea of prescription filed by defendant company affects any of the claims of Maddox for a period of about five months—between January 1, 1947 and May 19, 1947.

We believe that plea of prescription is good. We sustain it as above qualified. L.S.A.–Revised Civil Code of Louisiana, Articles 3536, 3537; Jones v. Texas & P. Ry. Co., 125 La. 542, 51 So. 582; Spyker v. International Paper Co., 173 La. 580, 138 So. 109; Rhodes v. International Paper Co., 174 La. 49, 139 So. 755; Young v. International Paper Co., 179 La. 803, 155 So. 231; Arkansas Natural Gas Co. v. Sartor, 5 Cir., 78 F.2d 924.

But the defendant urges a broader application of the plea of prescription. The contention is made that, from the language and nature of the opinion in the first suit followed by the language of the compromise agreement, limitation applies against Maddox for any future claim for final damages. Defendant urges that Maddox was not paid for just the three year's loss of the revenue from his well-established fishing business, but was paid for any and all future damages to his fishing business as well as for any permanent loss—and this is the most im-

portant—to the value of his property because of the pollution of the stream that runs by and through it.

■ From our language in the first suit, from the language of the agreement wherein in each paragraph there is a limitation to the effect that the payment is for damages that might hereafter arise (and the date is February 8, 1943) up to and including December 31, 1946, and from the allegations in the instant suit (notably in articles 10, 11, 12, and 15 of the complaint) which have been substantially proved at the trial, we are of the opinion that Maddox's action for damages for the injuries above described is not dead by limitation of time.

Plaintiff introduced a number of instruments recorded in the records of Bossier Parish, dated since the first suit, by which defendant acquired from some forty landowners owning land along this stream the perpetual right to discharge this effluent in Bodcau Bayou. The various amounts paid are for permanent damages to the property of such landowners. The considerations paid represent estimated damages, past, present, and prospective, resulting from the discharge of this effluent. The gross amount paid for these servitudes represents an investment of several hundred thousand dollars and the instruments are so drawn as to create, in favor of the defendant company, a servitude over and through such lands for the discharge of this effluent free from any further payment of damages.

Clearly, Maddox has never been so paid. The record is replete with circumstances and overt acts by the defendant company, whereby Maddox was lulled into believing that the pollution was to be totally corrected. Prior to defendant's recording of these instruments, it had made repeated promises to effectuate a more satisfactory method of disposing of its waste.

This suit for permanent damages was filed within one year after the instruments containing these servitudes were placed of record.

■ That the present condition on Bodcau is permanent and that defendant plans to continue its present policy of periodic discharge of its effluent into that stream is further attested by defendant's own witnesses. They state this periodic dumping is the method of causing the least interference with, if not damage to, fish life in this stream, and is the only feasible means by which to dispose of this effluent. Bodcau Bayou is a public stream, once actually navigated to a point above plaintiff's property. It is axiomatic that no one has a legal right to use a public stream for the purpose complained of herein.

We should recite some of the broad salients of this case. We quote from an expert of the defendant company:

"There are several considerations in deciding where to locate a mill. One is the proximity of a satisfactory source of raw material and that is usually the one that receives primary consideration. The second consideration is a source of water. It is not, unfortunately, often—let us put it this way—the industry cannot always find a location where those qualities are all opportune and when that happens, which is the case here, they have located the mill near a source of raw material, that is, wood. Unfortunately, the receiving stream, when they started was not large enough to take care of their waste but since they have installed this system of waste disposal it is my opinion that the mill is satisfactorily located."

■ The present policy of the defendant company (and we have no disapproval of it personally or officially) is to own the right of flowage through Bodcau Bayou. They are paying finally all the owners their legal claims for injuries. We should, considering the pleadings of both cases and the intervening compromise agreement, render a judgment of final adjudication between the parties.

Plaintiff owns a tract of land on Bodcau Bayou, on which is located his home and certain other improvements. One forty-acre tract extends to the Bayou and the Bayou touches two other forty-acre tracts. The remainder of plaintiff's land is high hill land located on a bluff and extending back some distance. A graveled public road cuts the property in a general east to west direction and crosses the Bayou on

plaintiff's property. The property is traversed by a rural electric line, making electric current available to any part of the four hundred acres.

For about twenty years plaintiff owned and operated a fishing camp and boat renting business on forty acres of land which he did not own and on which he had no lease agreement.[1] This land is owned by Arkansas Fuel Oil Co. and defendant now has a surface lease covering the right to use the forty acres on which plaintiff's fishing camp was located. Plaintiff has moved part of his equipment and testified that he was going to move the remainder to another location immediately north and located on the same Bayou.

Defendant owns and operates a large pulp and paper mill near Springhill, Louisiana, north of and upstream from plaintiff's property some twenty to twenty-five miles. The mill was constructed in 1937 and began operations in 1938, and since its operation began defendant has discharged its waste water through Bodcau Bayou. Defendant has large impounding basins located on the bank of Bodcau Bayou and Cypress Creek, a tributary, as a part of its plant site. Prior to 1943, defendant discharged its waste water intermittently throughout the year. Since 1943 it impounds the water and discharges it during favorable stream and weather conditions, beginning usually in November and extending into the winter until the basins are emptied. Plaintiff sued for damages, claiming losses which may be classified as follows:

1. Permanent damages, including the total destruction of fishing camp and business, loss of improvements and loss of value on remaining property and loss of sale price or diminution in value of land and also damages for inconvenience, nuisance, etc.

2. Claim for loss of profits for the year 1947 and 1948.

3. Plaintiff also seeks an injunction in the alternative only, prohibiting defendant from discharging its waste into Bodcau Bayou.

We must say that plaintiff has pleaded for all possible items and types of injuries. We must repeat what we said in the first case that there is no possible claim to him for injury to his cattle or to his grass.[2]

We accept as a fact that plaintiff has but one forty-acre tract that extends into the Lake[3] and that the Bayou touches only two of his other tracts. The remainder of plaintiff's acreage is high hill land located on a bluff and extending some distance. We accept as a fact that he does own where his home is presently located and that from the forty-acre tract on which he is now located he may go on to the next forty-acre tract which fronts on the Lake and to that frontage he may transport his landing platform and boats away from the place (not owned by him) where he has had them for years.

■ From the evidence in the record given by laymen on both sides and by the expert witnesses, we believe that there is still fishing to be had in Bodcau Bayou. This period of fishing would be approximately from April 1st to November 1st every year.

The defendant company, through continued use of its number of impounding basins, immediately at the main mill, wherein the effluent is considerably cleared by sedimentation and then followed in the last few years by a longer period of discharge than formerly, has brought about a situation whereby some fishing is still done in Bodcau Bayou. The long intermittent discharge prevents a lethal dose to be given the fish, as was common at the be-

---

1. Maddox is not totally a trespasser. He did file a formal letter of the Louisiana Oil Refining Corporation, signed by its vice-president, dated April 30, 1924, giving him, by indirection (through one, Stringfellow) "the exclusive right to erect and maintain a hunting and fishing camp" on the very forty acres whereon he did locate.

2. The defendant company started an experimental plot near the impounding basins and by irrigation, using the black effluent, grew gargantuan corn and tomato plants ten feet high.

3. Bayou Bodcau widens out and hence its being called a Lake at that point.

ginning of the operation of the defendant's mill. Fish, big and small, were killed then by the hundreds of thousands.

On this latter point we desire to quote Mr. Percy Viosca, a noted and reputable expert on the subject:

"Q. Mr. Viosca, at some time in the past—say, ten years ago, making an assumption for the purpose of a question that all of the fish in Bodcau were killed for some reason, what effect would that have on the later fishing in the stream—all of them below the mill? A. You have excellent bass fishing five months after the first breeding season which is about the 1st of April and better than usual bass fishing. Large mouth bass—crappie, you have catchable size crappie in about five or six months.

"Q. And other species of perch? A. And the small mouth bass would just about reach a legal limit in about six months.

"Q. Perch? A. You would have some perch generally, but a little undersize. They grow much more slowly because they are more crowded."

It is not questioned however but that the fishing of today will never be the wonderful fly casting type of fishing that was enjoyed before the installation of the defendant's mill. Those days are gone.

Also, the present waters of Bayou Bodcau will never be what they were before the days of pollution. We visited the premises at a period when the discharge was not at its flux and one can tell that the waters are not natural. The bottom soil and the stumps and submerged branches show the permanent imprint of the black.[4]

From the evidence in the record, we believe that the commercial fishing for buffalo is about gone; that is, it is certainly gone up Bayou Bodcau where Maddox' camp is located; buffalo might still be caught in the lower reaches of Bayou Bodcau.

There has been no reduction in value of plaintiff's property in five of his forty-acre tracts. It is still good for summer rest camps. It has the same trees on it and the foul odor of the water hardly reaches the area. These lands are worth more and more every year, irrespective of any fishing being connected with them, because of general prosperity, increase in population, lower purchasing power of the dollar, oil development not too far, etc. The summer residents on any one of these five forty-acre tracts might still enjoy old-style fishing (not fly casting) in Bayou Bodcau for approximately six months out of the year.[5] However, an idyllic stream, within short walking distance, has been lost.

Maddox will never have another day in court.[6]

## Damages

For the total destruction of the fishing camp and the fishing business wherein Maddox is deprived of the former revenue and for the ruining of his business in catching

---

4. Bodcau, before pollution: The varied and beautiful trees gracefully dressed its hilly and curving banks to the clean water's edge. It was a running stream, fed by springs; the ideal spot for lure fishing, fly casting!

5. This fish now caught from the waters of Bodcau, where for six months the effluent from the mill has flowed, is not sought much—to eat.

The French, however, have a witty proverb that might save the situation. "Eat with your mouth; do not eat with your eyes or with your nose." It is the taste that counts. When you eat snails or froglegs, do not use your eyes and see the snails or frogs in life. When you eat limburger cheese, if you are an expert, you do not smell the cheese at all.

When you eat fresh fish from Bodcau Bayou, taste its fine flavor—but do not see the polluted water. The writer of this opinion has made good on Bodcau fish. For a lifetime, too, he has made good on cheese, froglegs and snails.

6. There are two extremes for the future: (a) the black effluent may get to be packed in metal barrels and sold to the farmers of America as a concentrated liquid fertilizer (the stream regains its pristine beauty!); or (b) once the defendant company has legally "hacked" its way through the Bodcau basin, then the plant will be enlarged (natural to American industry) and the black effluent will pour thickly and incessantly throughout the year.

and selling fish, now and henceforth, we allow $5,000.

For the loss of improvements placed on plaintiff's property which have been rendered useless, we allow $250.

On the item of damages sought by plaintiff, entitled: "Complete loss and sale value of 400 acres of land wherein he is deprived of the sale thereof on the open market or the subdividing thereof into camp sites, and injury to the price of the property as it stands today," we have determined that he has lost the probable sale of camp sites in the two sections wherein his land borders the water. From the record the highest price that was paid for a camp site was $300. We believe the allowance by us of $1,200 for this claim would be fair and reasonable. We allow $1,200 for that item.

And for the permanent loss of a beautiful stream within walking distance of 200 acres, we allow $2.50 per acre, or the sum of $500.

For the loss of profits from the year 1947, and on, we think the sum of $1,000 should be fair and reasonable. We allow that much for that item.

So, we believe that as a final, complete, and permanent settlement of all his claims, present and future, and forever, the sum total of $7,950 is fair and reasonable.

Let judgment be prepared accordingly for our signature.