**Lorie Q. PRUITT, et al., Plaintiffs,**

v.

**ALLIED CHEMICAL CORPORATION, Defendant.**

**Civ. A. No. 77–0035–R.**

United States District Court, E. D. Virginia, Richmond Division.

Sept. 15, 1981.

Oren R. Lewis, Jr., Thomas P. Jennings, Michael S. Marcus, Richard H. Jones, Arlington, Va., J. Vernon Patrick, Jr., Barton S. Sacher, Berkowitz, Lefkovits & Patrick, Birmingham, Ala., Thomas A. Williams, Callao, Va., for plaintiffs.

G. H. Gromel, Jr., Joseph M. Spivey, III, Hunton & Williams, D. Alan Rudlin, Richmond, Va., for defendant.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiffs bring the instant action against Allied Chemical Corporation ("Allied") for Allied's alleged pollution of the James River and Chesapeake Bay with the chemical agent commonly known as Kepone.

Plaintiffs allege that jurisdiction vests with the Court pursuant to 28 U.S.C. § 1331 (federal question), § 1332 (diversity of citizenship), and § 1333 (arising in admiralty).

Plaintiffs allegedly engage in a variety of different businesses and professions related to the harvesting and sale of marine life from the Chesapeake Bay ("Bay").[1] All claim to have suffered economic harm from defendant's alleged discharges of Kepone into the James River and thence into the Bay. Plaintiffs assert their right to compensation under each of the dozen counts to their complaint. Defendant has moved to dismiss nine of those counts for failure to state a claim upon which relief can be granted. The parties have fully briefed the issues involved, and the matter is ripe for disposition.

Defendant moves to dismiss counts I, II, III, V, VII, VIII, IX, X and XII of the complaint as they apply to all plaintiffs other than those directly engaged in the harvesting of the Bay's marine life.[2] That is, defendant would dismiss these nine counts as to all plaintiffs except those classified in paragraph 6.A of the complaint (generally, fishermen, shellfishermen, and lessors of oysterbeds.) All plaintiffs, subject to defendant's motion, claim as damages lost profits resulting from their inability to sell seafood allegedly contaminated by defendant's discharges, and from a drop in price resulting from a decline in demand for seafood coming from areas affected by Kepone. These plaintiffs can generally be described as parties suffering only indirect harm to their property or businesses as the result of Kepone pollution.[3] They or their possessions have not been caused direct, physical damage by defendant. Instead, plaintiffs allege that the stream of profits they previously received from their businesses or employment has been interrupted, and they seek compensation for the loss of the prospective profits they have been denied. As plaintiffs' claims rely on various, radically different theories of liability, the Court considers each count, or group of similar counts, separately.

### Negligence and Products Liability

Counts I, II and V allege that negligence, of some degree, by defendant entitles plain-

---

1. Plaintiffs include commercial fishermen; seafood wholesalers, retailers, distributors and processors; restauranteurs; marina, boat tackle and baitshop owners; and employees of all the above groups.

2. Defendants would leave for further proceedings Counts IV (as now construed by plaintiffs), VI and XI. Those counts allege, generally, malicious and intentional injury by defend-

ants and violation of Va.Code Ann. § 18.2–499, 500 (conspiracy willfully to injure business).

3. In fact, none of the plaintiffs has suffered direct harm to his or its property. As discussed below, the plaintiffs not subject to defendants' motion to dismiss obviously do not own the marine life that they harvest or the water in which that life flourishes.

tiffs to recover.[4] Count III alleges that the effluents released by defendant were "defective and unreasonably dangerous", and that defendant should be strictly liable for any harm caused by its discharges. All of these counts arise from the Court's diversity jurisdiction and rely on theories of state tort law.

The Virginia Supreme Court has, to the Court's knowledge, never directly considered the question of recovery for loss of prospective economic benefits. It is commonly stated that the general rule both in admiralty and at common law has been that a plaintiff cannot recover for indirect economic harm.[5] The logical basis for this rule is obscure. Although Courts have frequently stated that economic losses are "not foreseeable" or "too remote", these explanations alone are rarely apposite. As one well-respected commentator has noted, "the loss to plaintiff in each case . . . would be readily recoverable if the test of duty—or remoteness—usually associated with the law of negligence were applied."[6]

The Court frankly acknowledges the fact that there exist a substantial number of cases that may be construed to establish a general rule favorable to plaintiffs.[7] As noted by the Ninth Circuit in *Union Oil Co. v. Oppen,* 501 F.2d 558 (9th Cir. 1974), the general rule has found application in a wide variety of contexts:

[T]he negligent destruction of a bridge connecting the mainland with an island, which caused a loss of business to the plaintiff who was a merchant on the island, has been held not to be actionable. . . . A plaintiff engaged in commercial printing has been held unable to recover against a negligent contractor who, while engaged in excavation pursuant to a contract with a third party, cut the power line upon which the plaintiff's presses depended. . . . A defendant who negligently injures a third person entitled to life-care medical services by the plaintiff is liable to the third person but not to the plaintiff. . . . The operators of a dry dock are not liable in admiralty to charterers of a ship, placed by its owners in the dry dock, for negligent injury to the ship's propeller where the injury deprived the charterer of the use of the ship.

501 F.2d at 563–64 (citations omitted).

Nevertheless, there also exist cases that conflict with this broadly recognized general rule.[8] At least two of the minority cases deal with precisely the case present here: the loss of business opportunities due to pollution of streams adjoining a plaintiff's property.[9] Moreover, even defendant concedes that a third case, *Union Oil, supra,* that provided compensation for fishermen for losses caused by pollution from oil spills, is correctly decided. Although defendant would distinguish *Union Oil* as limited sole-

---

**4.** Count I asserts that in discharging Kepone into the James, defendants were guilty of simple negligence.

Count II asserts that the discharge of Kepone amounted to an ultra-hazardous activity that demanded an additional degree of care from defendant, and alleges that defendant failed to use such care.

Count V alleges that the defendant is guilty of gross negligence.

**5.** *See* Prosser, *Law of Torts,* § 130 at 952 (1971); *Restatement (2d) of Torts,* § 766C (Tentative Draft No. 23) (April 5, 1977).

**6.** James, *Limitations of Liability for Economic Loss Caused by Negligence: A Pragmatic Appraisal,* 25 Vand.L.Rev. 43 (1972). Prof. James has gone on to state that "the prevailing distinction between indirect economic loss and physical damage is probable a crude and unreliable one that may need reexamination if a

limitation on liability for pragmatic reasons is to be retained." *Id.* at 50–51.

**7.** *See, e. g., Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927); *Byrd v. English,* 117 Ga. 191, 43 S.E. 419 (Ga.1903); *Rickards v. Sun Oil Co.,* 23 N.J.Misc. 89, 41 A.2d 267 (1945). *See generally Union Oil Co. v. Oppen,* 501 F.2d 558, 563–65, 570 (9th Cir. 1974) (discussing earlier case law).

**8.** *See generally Prosser* § 130 nn.79–83; *Union Oil,* 501 F.2d at 565–67.

**9.** *See Masonite Corp. v. Steede,* 198 Miss. 530, 23 So.2d 756, 757 (1945) (owner of limited access to river entitled to compensation); *Maddox v. International Paper Co.,* 105 F.Supp. 89, 93–94 (W.D.La.1951) (owner of fishcamp entitled to compensation).

ly to those who labor on the water (but not at its edge) the rationale for creation of this particular distinction is unclear.

Given the conflicting case law from other jurisdictions, together with the fact that there exists no Virginia law on indirect, economic damages, the Court has considered more theoretical sources in order to find a principled basis for its decision. There now exists a considerable amount of literature on the economic rationale for tort law.[10] In general, scholars in the field rely on Judge Learned Hand's classic statement of negligence[11] to argue that a principal purpose of tort law is to maximize social utility: where the costs of accidents exceeds the costs of preventing them, the law will impose liability.

The difficulty in the present case is how to measure the cost of Kepone pollution.[12] In the instant action, those costs were borne most directly by the wildlife of the Chesapeake Bay. The fact that no one individual claims property rights to the Bay's wildlife could arguably preclude liability. The Court doubts, however, whether such a result would be just. Nor would a denial of liability serve social utility: many citizens, both directly and indirectly, derive benefit from the Bay and its marine life. Destruction of the Bay's wildlife should not be a costless activity.

In fact, even defendant in the present action admits that commercial fishermen are entitled to compensation for any loss of profits they may prove to have been caused by defendant's negligence. The entitlement given these fishermen presumably arises from what might be called a constructive property interest in the Bay's harvestable species. These professional watermen are entitled to recover despite any direct physical damage to their own property. Presumably, sportsfishermen share the same entitlement to legal redress for damage to the Bay's ecology.[13] The Court perceives no valid distinction between recognition of commercial damages suffered by those who fish for profit and personal harm suffered by those who fish for sport.[14]

The claims now considered by the Court, however, are not those of direct users of the Bay, commercial or personal. Instead, defendant has challenged the right of those who buy and sell to direct users of the Bay, to maintain a suit.

Defendant would have the Court draw a sharp and impregnable distinction between parties who exploited the Bay directly, and those who relied on it indirectly. In *Union Oil*, the Ninth Circuit suggested that it might make such a distinction if it were ever required to decide the issue.[15] The

10. *See, e. g.* R. Posner, *Economic Analysis of Law*, 119–62 (1977); G. Calabresi, *The Costs of Accidents* (1970).

11. *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947), in which Judge Hand stated that a person's duty to prevent injuries from an accident "is a function of three variables: (1) The probability that [the accident will occur]; (2) the gravity of the resulting injury, if [it] does; (3) the burden of adequate precautions."

12. For the purposes of the present motion, the Court must assume that the defendants were negligent in the discharge of Kepone, and that this discharge caused the injuries alleged by plaintiffs. The Court makes no independent finding regarding these issues.

13. A sportsman who sued would, of course, still be required to prove his damages to a legally acceptable degree of certainty. Moreover, in a federal court he would have to satisfy any applicable jurisdictional amount. Never-

theless, the Supreme Court has stated that purely personal, aesthetic damage may be sufficiently determinate to satisfy the case or controversy clause of Article III. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

14. *E. g.*, if chemicals discharged into the water had harmed fishermen's boats, rather than the Bay's fishlife, there would be no need to distinguish between a sportsman's basic right to sue for damages, and a professional waterman's right. Of course, in the instant case, a sportsman's actual damages would be considerably more speculative. Nevertheless, under the theory of liability now considered by the Court, a sportsman would still have at least a chance to prove his damages.

15. *See* 501 F.2d at 570 ("[o]ur holding . . . does not open the door to claims that may be asserted by those, other than commercial fishermen, whose economic or personal affairs were dis-

panel in *Union Oil*, however, did not have to decide the question now facing this Court—and the Court does not perceive that there exists so simple a distinction as defendant would urge it to construct.

None of the plaintiffs here—including commercial fishermen—has suffered any direct damage to his private property. All have allegedly suffered economic loss as a result of harm to the Bay's ecology. Apart from these similarities, the different categories of plaintiffs depend on the Bay in varying degrees of immediacy. The commercial fishermen here fit within a category established in *Union Oil*: they "lawfully and directly make use of a resource of the sea." [16] The use that marina and charter-boat owners make of the water, though hardly less legal, is slightly less direct. (And indeed, businesses in similar situations have been held entitled to recover in other courts.) [17] Still less direct, but far from nonexistent, is the link between the Bay and the seafood dealers, restauranteurs, and tackle shops that seek relief (as do the employees of these establishments).

One meaningful distinction to be made among the various categories of plaintiffs here arises from a desire to avoid double-counting in calculating damages.[18] Any seafood harvested by the commercial fishermen here would have been bought and sold several times before finally being purchased for consumption.[19] Considerations both of equity and social utility suggest that just as defendant should not be able to escape liability for destruction of publicly owned marine life entirely, it should not be caused to pay repeatedly for the same damage.

The Court notes, however, that allowance for recovery of plaintiffs' lost profits here would not in all cases result in double-counting of damages. Plaintiffs in categories B, C, D, E, and F [20] allegedly lost profits when deprived of supplies of seafood. Those profits represented a return on the investment of *each* of the plaintiffs in material and labor in their businesses, and thus the independent loss to each would not amount to double-counting. Conversely, defendants could not be expected to pay, as a maximum, more than the replacement value of a plaintiff's actual investment, even if the stream of profits lost when extrapolated into the future, would yield greater damages.

Tracing the stream of profits flowing from the Bay's seafood, however, involves the Court in other complexities. The employees of the enterprises named in categories B through F, for example, had no physical investment in their employers' businesses. Yet if plaintiffs' allegations are proven, these employees undoubtedly lost wages and faced a less favorable job market than they would have, but for defendant's acts, and they have thus been harmed by defendant. What is more, the number of parties with a potential cause of action against defendant is hardly exhausted in plaintiffs' complaint. In theory, parties who bought and sold to and from the plaintiffs named here also suffered losses in business, as did their employees. In short, the set of potential plaintiffs seems almost infinite.

Perhaps because of the large set of potential plaintiffs, even the commentators most critical of the general rule on indirect dam-

commoded by the oil spill. . . . Nothing said in this opinion is intended to suggest . . . that every decline in the general commercial activity of every business in the . . . area following the [spill] constitutes a legally cognizable injury for which the defendants may be responsible.").

**16.** 501 F.2d at 570.

**17.** *See Maddox, supra,* 105 F.Supp. 89 (fish camp); *Masonite, supra,* 198 Miss. 530, 23 So.2d 756 ("fishery business", including right of way to water). *See also Hampton v. North Carolina Pulp Co.,* 223 N.C. 535, 27 S.E.2d 538

(N.C.1943) (nuisance case, riparian property owner).

**18.** *See Venore Transportation Co. v. M/V Struma,* 583 F.2d 708, 710 (4th Cir. 1978) (a tortfeasor should "pay for loss of use . . . once, but no more").

**19.** Indeed, plaintiffs here apparently contain a representative of every level of seafood distribution between fisherman and consumer.

**20.** Respectively, seafood wholesalers, retailers, processors, distributors and restauranteurs.

ages have acknowledged that some limitation to liability, even when damages are foreseeable, is advisable.[21] Rather than allowing plaintiffs to risk a failure of proof as damages become increasingly remote and diffuse, courts have, in many cases, raised an absolute bar to recovery.

 The Court thus finds itself with a perceived need to limit liability, without any articulable reason for excluding any particular set of plaintiffs. Other courts have had to make similar decisions.[22] The Court concludes that plaintiffs who purchased and marketed seafood from commercial fishermen suffered damages that are not legally cognizable, because insufficiently direct. This does not mean that the Court finds that defendant's alleged acts were not the cause of plaintiffs' losses, or that plaintiffs' losses were in any sense unforeseeable. In fact, in part because the damages alleged by plaintiffs here were so foreseeable, the Court holds that those plaintiffs in categories G, H and I[23] have suffered legally cognizable damages. The Court does so for several reasons. The United States Court of Appeals for the Fourth Circuit has held, in admiralty, that a defendant should "pay ... once, but no more" for damages inflicted.[24] While commercial fishing interests are protected by allowing the fishermen themselves to recover, it is unlikely that sportsfishing interests would be equally protected. Because the damages each sportsman suffered are likely to be both small[25] and difficult to establish, it is unlikely that a significant proportion of

such fishermen will seek legal redress. Only if some set of surrogate plaintiffs is entitled to press its own claims which flow from the damage to the Bay's sportfishing industry will the proper balance of social forces be preserved. Accordingly, the Court holds that to the extent plaintiffs in categories G, H and I suffered losses in sales of goods and services to sportsfishermen as a result of defendant's tortious behavior, they have stated a legally cognizable claim.[26]

Defendant hardly has reason to complain of the equity of the Court's holding. First, it benefited above from the Court's exclusion of the claims of innocent businessmen in categories B through F who are probable victims of their alleged acts. Here, the Court applies different restrictions on liability for reasons of equity and efficiency previously addressed. Second, the "directness" of the harm, at least to plaintiffs in categories G and I,[27] is high here. Both operate on the water or at its edge. Finally, the Court is influenced by similar decisions as to liability in cases such as *Maddox v. International Paper Co.*, 105 F.Supp. 89 (W.D.La. 1951) and *Masonite Corp. v. Steede*, 198 Miss. 530, 547, 23 So.2d 756 (1945). The Court's conclusion results from consideration of all these factors, and an attempt to tailor justice to the facts of the instant case.

### Admiralty Claims

 Plaintiffs' Count VIII alleges that defendant may be held liable under the law

---

**21.** *See James, supra,* n.6, 25 Vand.L.Rev. at 49–55; *Petition of Kinsman Transit Co.,* 338 F.2d 708, 725 (2d Cir. 1964) *cert. denied sub nom. Continental Grain Co. v. Buffalo,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965) (hereinafter cited as *Kinsman I* (Friendly, J.).

**22.** *See e. g.,* Judge Kaufmann's opinion in *Petition of Kinsman Transit Co.,* 388 F.2d 821, 824–25 (2d Cir. 1968) (hereinafter cited as *Kinsman II*), where the court noted that

in the final analysis, the circumlocution whether posed in terms of 'foreseeability,' 'duty,' 'proximiate [sic] cause,' 'remoteness,' etc. seems unavoidable.

and then turned to Judge Andrews well-known statement in *Palsgraf v. Long I.R. Co.,* 248 N.Y. 339, 162 N.E. 99, 104 (N.Y.1928):

It is all a question of expediency ... of fair judgment, always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.

**23.** Boat, tackle and bait shop, and marina owners respectively.

**24.** *Venore, supra,* 583 F.2d at 710.

**25.** The net loss to any sportsman would have to take into account any enjoyment received from natural areas visited as a substitute to the Chesapeake Bay.

**26.** *Cf.* Calabresi, *supra,* n.10 at 91 (search for least cost avoider).

**27.** Generally boat and marina owners.

of admiralty. Defendant moves to dismiss this claim on the same ground previously discussed: that indirect damage to economic expectancies cannot serve as a basis of liability. Defendant argues that this case is governed by the holding of the Supreme Court in *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). The Court is not convinced that *Robins* itself is dispositive here. Nevertheless, in light of *Robins* and subsequent cases thereunder, the Court concludes that the challenged claims of plaintiffs should be dismissed.

In *Robins*, a plaintiff had chartered a ship that was negligently damaged while in dry dock. As a result of the damage and consequent delay, plaintiff suffered losses. Rather than sue the ship's owner for breach of contract,[28] the charter-party sued the dry dock. Justice Holmes, for the Court, held that "the law does not spread its protection so far" as to protect a party from economic loss caused by unintentional torts by third parties against those with whom the original party has continued to do business.

*Robins* is consistent with defendant's position. It is, however, arguably less than dispositive here, because it essentially involved questions of the law of third party contracts not necessarily applicable in the instant case. Although subsequent cases in some circuits have applied *Robins* in a manner that would defeat plaintiffs' claims here,[29] the United States Court of Appeals for the Fourth Circuit has significantly qualified *Robins'* reach. In *Venore Transportation Co. v. M/V Struma*, 583 F.2d 708 (4th Cir. 1978), the court held that a charterer of a ship could recover monies it paid the ship's owner under the charter while the ship was disabled due to the defendant's negligence. The result in *Venore* is eminently just: the defendant did not escape liability for its negligence, while the court was able to establish a simple rule to prevent the payment of excessive or open-ended damages.

Application of *Venore* here, however, is not straightforward. The *Venore* court specifically adopted an approach that "would require that the [offending party] pay for loss of use of the damaged vessel once, but no more." [30] Thus, as the Court concluded in the preceding section, the instant defendant may be held liable to plaintiff commercial fishermen, but not to those businesses which purchase the fishermen's harvest.[31]

Again, the plaintiffs in categories G through I present a special case. As discussed in the preceding section, the transaction costs involved in a suit by sportsfishermen may allow defendant to avoid compensating the sportsfishing industry of the Bay even once for the damage allegedly done. The Court would be inclined to allow plaintiffs in categories G through I to serve as surrogates for the sportsmen, were it not for the somewhat uneasy relation between *Robins* and *Venore*, both of which bind this Court. In order to avoid the effect of *Robins*, the *Venore* court distinguished, sharply, between competing rules of damages. As construed in *Venore*, *Robins* prohibits com-

**28.** It is not clear whether plaintiff in *Robins* had a viable contract claim. *See id.* at 307, 48 S.Ct. at 134 (contract for charter suspended while ship being serviced).

**29.** *See Matter of Bethlehem Steel Corp.*, 631 F.2d 441, 448 (6th Cir. 1980), *cert. denied sub nom. Marriott Corp. v. Bethlehem Steel Corp.*, 450 U.S. 921, 101 S.Ct. 1370, 67 L.Ed.2d 349 (1981); *Louisville & N.R. Co. v. M/V Bayou Lacombe*, 597 F.2d 469 (5th Cir. 1979). *Cf. Kinsman I* and *Kinsman II, supra.*

**30.** 583 F.2d at 710.

**31.** In *Henderson v. Arundel Corp.*, 384 F.2d 998 (4th Cir. 1967), *affirming* 262 F.Supp. 152 (D.Md.1966), the United States Court of Appeals for the Fourth Circuit ruled that employees may not recover lost wages from a ship which had collided with and disabled the dredge on which the employees worked. The admiralty claims of the various employees here in all categories except category A (commercial fishermen), then, must be dismissed. The Court will not construe what it holds to have been dictum in *Arundel, id.* at 160, to bar payment of compensation to employees of fishermen in category A, simply because plaintiffs in *Arundel* were not fishermen. *See Carbone v. Ursich*, 209 F.2d 178, 182 (9th Cir. 1953); *Union Oil, supra.*

pensation for profits lost by the party indirectly injured. In *Venore*, plaintiff recovered only profits that *would have been lost by the party directly damaged—i. e.*, the cost of the charter paid by plaintiff to the shipowner. Thus, *Venore* itself would bar recovery of lost profits by those who bought from commercial fishermen.

The other persons suffering direct damage herein, the sportsfishing category, bought rather than sold goods and services to and from the indirectly injured parties. Instead of leasing from the directly injured party as in *Robins* and *Venore*, the charterers suffered direct damage. Because of this factual difference, the profits lost by plaintiff marina owners, etc. do not serve as accurate an indicator of the loss to the directly injured party as the contract price in *Venore*. Although, as discussed in the preceding section, the Court has held that these indirect costs may serve as a useful surrogate in tort, the tightrope walked in *Venore* between unbridled liability and the *Robins* rule leaves no room for such relief in admiralty. *Robins* may be avoided, as *Venore* shows, but it cannot be ignored completely. Accordingly, the admiralty claims of all plaintiffs except those in category A shall be dismissed.

*Implied Cause of Action for Statutory Violations*

■ Plaintiffs next allege, in Counts VIII and IX, that defendant has violated, respectively, the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 401 *et seq.*, and the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. §§ 1251–1375. Plaintiffs contend that these federal statutes create an implied cause of action for parties such as themselves.[32] Since the filings of the parties' motions, however, this Court has determined that the FWPCA does not support an implied cause of action. *Chesapeake Bay Foundation, Inc. v. Virginia State Water Control Board*, 495 F.Supp. 1229 (E.D.Va.1980). The Court will not re-

peat the reasoning of its earlier opinion other than to reaffirm its result: the FWPCA itself does not provide plaintiffs with a cause of action. An examination of the statutory scheme that embodies the Rivers and Harbors Act reveals that Congress did not intend that that Act, any more than the FWPCA, support an implied cause of action. Accordingly, plaintiffs' counts VIII and IX will be dismissed as to all plaintiffs. For the same reasons, plaintiffs' Count X, which alleges that defendant conspired to violate the two federal statutes in question, is fatally defective, and will be dismissed.[33]

*Nuisance*

Plaintiffs' final theory of liability is one of nuisance. The Virginia Supreme Court recognizes nuisance as a basis of liability, *see e. g., Sam Finley, Inc. v. Waddell*, 207 Va. 602, 151 S.E.2d 347 (1966); *Smith v. Pittson Co.*, 203 Va. 711, 127 S.E.2d 79 (1962), but has never decided whether a claim of nuisance applies to indirect economic injuries. Without further unnecessary and burdensome discussion, the Court adopts the reasoning it applied to the above counts alleging negligence. Plaintiffs in categories B, C, D, E and F shall be dismissed; defendant's motion will be denied as to all other plaintiffs.

An appropriate order shall issue.

### ORDER

In accordance with the memorandum of the Court this day filed, and the deeming it just and proper so to do, it is ADJUDGED and ORDERED as follows:

1. Defendant's motion to dismiss be, and same is hereby granted as to plaintiffs in categories B through F of the complaint, and all counts of the complaint except Counts IV, VI, and XI be, and they are hereby dismissed as to those plaintiffs.

2. Defendant's motion to dismiss Counts I, II, III, V and XII be, and the same is

---

**32.** *See Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

**33.** To the extent that this Count merely realleges that defendants acted intentionally, the valid claims contained in Count X are entirely contained in plaintiffs' Counts IV, VI and XI.

hereby denied as to plaintiffs in categories G, H and I of the complaint.

3. Defendant's motion to dismiss Count VII as to plaintiffs in categories G through I be, and hereby is granted, and that Count is hereby dismissed as to those plaintiffs.

4. The claims of all parties in Counts VIII, IX, and X be, and they are hereby dismissed.