**YARMOUTH SEA PRODUCTS LIMITED, Plaintiff,**

v.

**S/V COYOTE, Helen Davis, Owner, and David Scully, Charterer, Defendants.**

Civil A. No. 2:94–2496–8.

United States District Court, D. South Carolina, Charleston Division.

Nov. 27, 1995.

John Hughes Cooper, Sullivans Island, SC, for plaintiff.

Andrew K. Epting, Jr., Charleston, SC, for defendants.

BLATT, Senior District Judge.

This court held a nonjury trial on May 15, 1995, in the above-entitled civil admiralty action. Having heard the testimony, reviewed documentary evidence, and considered the arguments of counsel, now, after due consideration, this Court makes the following findings of fact and reaches the following conclusions of law:

*The Parties*

1. The 60′ custom design sailing yacht COYOTE, Official Number 988314, was owned by World One Sailing, Inc. ("World One"). A warrant for arrest of the COYOTE pursuant to Supplemental Admiralty Rule C was issued at the commencement of this action. Security was posted and was substituted for the vessel in this action, and the vessel was allowed to sail. Thereafter, Plaintiff agreed to dismiss the action against all named Defendants except David Scully ("Scully").

2. On or about July 28, 1994 World One demise chartered COYOTE to Scully who was to compete in a single handed sailboat race around the world, known as the BOC Challenge ("BOC").

3. Yarmouth Sea Products Limited ("Yarmouth") is a fleet owner of sword fishing vessels and is a wholesale fish broker. Yarmouth owned the 65' wooden hull Canadian flag fishing vessel LADY OLIVE MARIE. The captain and 6 crewmembers of the LADY OLIVE MARIE fished the vessel on layshares with Yarmouth.

### The Collision

4. On August 24, 1994, at approximately 0430 hours, near the George's Bank in Canadian fishing waters some 130 miles from Yarmouth, Nova Scotia, Canada, the COYOTE collided nearly head on with the port side of the LADY OLIVE MARIE. All testimony at trial was that the point of collision was as diagramed on Plaintiff's Exhibit 8 reproduced below.*

5. At the time of collision, the COYOTE was sailing downwind at 5 to 8 knots and the LADY OLIVE MARIE was stopped with her engines in neutral.

6. The wind was from the northeast at 25 to 35 knots and the seas were 10 to 15 feet.

7. Scully was single handing COYOTE from Horta, Azores to Newport, Rhode Island as the qualifying voyage for his competition in the BOC. The crew of 7 on the LADY OLIVE MARIE were waiting for dawn and subsiding weather to begin fishing.

* Editor's Note: Plaintiff's Exhibit 8 is reproduced on page 195.

8. At the time of the collision, Gordon Gray was on watch, monitoring the radar, and keeping a look-out from the wheelhouse of the LADY OLIVE MARIE.

9. At the time of the casualty, Scully was in the cockpit of COYOTE, but could not say at trial whether or not he was asleep. Scully's testimony was that he did not see LADY OLIVE MARIE until after the collision, that it was possible that he dozed off while in the cockpit, that "one does tend to drift in and out of a sort of light sleep," but that he couldn't really say whether he was awake or asleep just before the collision. Scully agreed with his deposition testimony, "I cannot say with certainty that I was 100 percent alert and out and looking around. On the other hand, I can't say with 100 percent certainty that I was fast asleep. So, you know, I would say that ... I was somewhere in between the two states." Scully acknowledged his written description of the accident in block 44 of the form CG–2692 Report of Marine Accident (Pl.Ex. 5), which states, "Sailing downwind, I heard a loud bang, looked up, and saw another boat, a fishing trawler alongside the port beam." The Court finds that this statement given shortly after the accident is trustworthy, and concludes from this statement and his other testimony that Scully was either asleep or failed to keep a proper lookout at the time of the collision.

PLAINTIFF'S
EXHIBIT

8

10. On the night of the collision, the LADY OLIVE MARIE was equipped with 2 radars and both were operating properly, although sea clutter obscured radar targets within about 2 or 2.5 miles. COYOTE was equipped with one radar, but it was not in operation due to failure of COYOTE's electrical generator and an effort to conserve battery power.

11. On the night of the collision, the LADY OLIVE MARIE was equipped with VHF and SSB marine radios and both were operating. On the night of the casualty, neither of COYOTE's 2 VHF radios were in operation.

12. At the time of the casualty, Scully was not keeping a proper look-out by sight or by hearing or by radar.

13. On the night of the collision, the LADY OLIVE MARIE displayed properly illuminated navigation lights and fishing lights.

14. On the night of the casualty, COYOTE's mast top navigation lights were not functioning. Approximately 8½ hours before the casualty, Scully knew he was entering an area frequented by fishing boats and he sighted the lights of fishing vessels on the horizon. At this time he rigged an emergency flashlight powered by two D-cell batteries as an emergency stern light on COYOTE and an emergency flashlight with red and green lenses powered by two D-cell batteries as emergency bow lights on COYOTE.

15. Although Scully rigged the emergency navigation lights on COYOTE and observed them properly illuminated approximately 8½ hours before the casualty, the preponderance of the evidence is, and this Court finds, that these lights were not illuminated just before and at the time of the casualty.

16. The lookout on the LADY OLIVE MARIE did not see COYOTE because COYOTE was not displaying navigation lights.

17. Upon collision, the bowsprit of COYOTE punctured the wooden hull of LADY OLIVE MARIE. The wind blew the stern of COYOTE around and brought the vessels port to port and a line from COYOTE became fouled in a part of the railing of LADY OLIVE MARIE. After a short time, part of the railing of LADY OLIVE MARIE broke loose and the vessels separated.

18. After the collision Scully did not identify himself, ascertain damage to the LADY OLIVE MARIE or crew, or offer assistance to the LADY OLIVE MARIE or crew. The crew of LADY OLIVE MARIE lost sight of COYOTE.

19. After the vessels parted, Captain of LADY OLIVE MARIE, David Belliveau, looked for COYOTE, but saw only the lights of the F/V ANGELA ROSE and the F/V ENDURANCE, both more than 5 miles away. Capt. Belliveau repeatedly called for COYOTE on VHF radio, but received no reply. Capt. Belliveau monitored his 2 radars, but was unable to detect any sign of COYOTE, although the other fishing boats were visible on radar. Capt. Belliveau contacted the ANGELA ROSE and the ENDURANCE and requested that they search for COYOTE on radar. Capt. Belliveau posted crewmembers on the bow to look for COYOTE and, after radio contact with the Canadian Coast Guard, began a search for COYOTE. Sometime later, the crew of ENDURANCE informed Capt. Belliveau by radio that for a few seconds they had detected a faint radar target which could have been COYOTE some 10 miles away from LADY OLIVE MARIE, but that the crew of ENDURANCE was unable to find the target again.

20. Except for sea clutter within about 2 miles, the radars on the LADY OLIVE MARIE detected buoys and other vessels without apparent problem before and after the casualty. Upon return to port after the casualty, the radars on the LADY OLIVE MARIE were tested and found operable by the Coast Guard. The radars of the LADY OLIVE MARIE did not detect COYOTE before the collision. After the collision, neither the LADY OLIVE MARIE nor the ENDURANCE nor the ANGELA ROSE nor the Coast Guard could detect COYOTE on radar, except for a brief faint signal possibly from COYOTE received by ENDURANCE.

21. Considering the circumstances, this Court finds no fault with LADY OLIVE MARIE for failure to detect COYOTE by sight, by hearing, or by radar before the collision.

22. While searching for COYOTE, Capt. Belliveau noticed unnatural handling of LADY OLIVE MARIE. Upon inspection, he found her fish hold nearly full of water. Attempts to pump her out with her own pumps were unsuccessful and Capt. Belliveau began a series of radio distress calls. With assistance from the ENDURANCE, Canadian Coast Guard, and United States Coast Guard, LADY OLIVE MARIE was finally pumped out some 10½ hours after the casualty. Due to the damage, LADY OLIVE MARIE was forced to return to port for repairs, but the ENDURANCE continued to fish in the area with good success.

*Damages*

23. The LADY OLIVE MARIE sustained C$ 6,541.91 (Canadian dollars) damage to her hull as a result of the collision.

24. The cost of fuel, bait, and groceries for the subject voyage was C$ 3,878.06, which was paid in full by Yarmouth. Ice was also paid in full by Yarmouth, but the cost of ice is not reimbursed to Yarmouth before calculation of the crew's layshares.

25. Under the terms of Yarmouth's layshare agreement with Capt. Belliveau and the other 6 crew members, Yarmouth would provide the LADY OLIVE MARIE and necessary ice for 40% of the boat price of the catch after reimbursement for fuel, bait, and groceries. The crew, including Capt. Belliveau, would fish the vessel for 60% of the boat price of the catch, after reimbursement for fuel, bait, and groceries. Yarmouth would also pay Capt. Belliveau an additional 5% fee for taking on the responsibilities as Captain of the vessel. When the catch was landed, Yarmouth would credit the fishermen's accounts with their portion of the net dock value of the catch and hold the catch for resale by Yarmouth's brokerage division. Under the agreement, Yarmouth holds the crew shares in trust and must pay the crew from any proceeds from sale of fish or from this action.

26. As agreed, Yarmouth provided the vessel and purchased ice, fuel, bait, and groceries for the fishing voyage.

27. After the casualty, Yarmouth could not recover any of the fixed costs of the vessel, such as insurance, mortgage payments, etc., nor could Yarmouth recover any of the variable costs of the ice, fuel, bait, or groceries, all of which were consumed, contaminated, or lost. Yarmouth has not paid Capt. Belliveau and the crew, but under the agreement Yarmouth holds the crew's share in trust and is obligated to pay the crew its share of any recovery in this action.

28. Capt. Belliveau and the crew were obligated to the LADY OLIVE MARIE and could not quickly or easily obtain employment on another vessel. When the vessel was damaged and returned to port, she lost her place in line on the fishing grounds. The crew could not obtain alternate employment and the LADY OLIVE MARIE could not return to a favorable place in line.

29. The actual catch and the actual revenues of the 55′ ENDURANCE is the best evidence of how much the 65′ LADY OLIVE MARIE would have caught on this voyage but for the casualty. The ENDURANCE fished in the same fishing hole during part of the same time LADY OLIVE MARIE would have fished but for the casualty.

30. On the trip in question, the ENDURANCE actually caught 21,630 pounds of fish which were actually sold at boat price for a total of C$85,182.10. This is the best estimate of the loss of gross revenues to Yarmouth's boat division.

31. The crew's share of this would be calculated by subtracting from the C$85,182.10 gross revenue the C$3,878.06 fuel, bait, and groceries to get C$81,304.04 net revenue, which should be multiplied by the crew's share of 60% to get C$48,782.42 crew's share, which at the stipulated exchange rate of .7377 is equivalent to $35,986.79 in U.S. dollars, which, with $2,721.19 interest for 460 days at the stipulated prejudgment interest rate of 6% per annum, becomes $38,707.98.

32. Similarly, Capt. Belliveau's additional 5% captain's fee would be calculated by multiplying C$81,304.04 net revenue by 5% to get C$4,065.20, which at the stipulated exchange rate of .7377 is equivalent to $2,998.90 in U.S. dollars, which, with $226.77 interest for 460 days at the stipulated prejudgment interest rate of 6% per annum, becomes $3,225.67.

33. Yarmouth's brokerage division averaged C$.34 net profit on each pound of fish resold, which indicates a total loss of brokerage to Yarmouth of C$7,354.20, for 21,630 pounds of fish at C$.34 per pound.

34. The total of C$6,541.91 hull damage, C$85,182.10 loss of fishing catch, and C$7,354.20 loss of brokerage is C$99,078.21, which at the exchange rate of .7377 is equivalent to $73,090.00 in U.S. dollars.

35. A recovery of $73,090.00 plus interest will make Yarmouth whole. A reasonable prejudgment interest rate is 6% per annum simple interest. Simple interest at 6% on $73,090.00 for 460 days is $5,526.81. Thus, Yarmouth has sustained damages from the casualty in the amount of $73,090.00, plus $5,526.81 interest, for a total of $78,616.81, including portions held in trust for Captain (see ¶ 32 above) and crew (see ¶ 31 above).

### Conclusions of Law

1. This Court has jurisdiction over the subject matter, 28 U.S.C. § 1333, and over the parties.

2. A moving vessel is presumed to be at fault in a collision with a stationary visible object. *The OREGON,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895). Since the COYOTE was the moving vessel in the instant case, she is presumed to be at fault in the collision with the LADY OLIVE MARIE which was stationary and visible with her navigation lights and her fishing lights illuminated. Scully and COYOTE failed to offer any evidence to rebut this presumption. Rule 5 of the International Rules of the Road, 33 U.S.C. § 1602 provides: *"Rule 5: Look–Out:* Every vessel shall at all times maintain a proper look-out by sight and hearing as well as by all available means appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and the risk of collision." Scully failed to maintain a look-out by sight or by hearing or by other available means such as radar or radio. All the credible evidence is that Scully failed to maintain a proper look-out before and at the time of collision. The rules of the road must be followed precisely. "They are not mere prudential regulation, but binding enactments, obligatory from the time that the necessity for precaution begins, and continuing so long as the means and an opportunity to avoid the danger remains.... Obviously they must be rigorously enforced in order to attain the object for which they were framed, which could not be secured if the masters of vessels were permitted to indulge their discretion in respect of obeying or departing from them." *Belden v. Chase,* 150 U.S. 674, 14 S.Ct. 264, 37 L.Ed. 1218 (1893). A vessel which violates any statutory duty or rule of the road must prove that the violation *could not have contributed* to the collision in order to avoid liability. *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874). The violator's burden of proof on this issue is "clear and convincing" evidence. *Churchill v. F/V Fjord,* 892 F.2d 763, 1990 AMC 2085 (9th Cir.1988). In the instant case all credible evidence is that Scully failed to keep a look-out and that Scully's failure to keep a look-out was the sole proximate cause of the collision. Scully cannot avoid liability for this fault.

3. The proximate cause of the collision was the failure of Scully to keep a look-out while COYOTE was underway. Scully had seen the lights of fishing boats on the horizon and knew he was entering an area frequented by fishing boats. A contributing cause of the collision was the failure of Scully to display navigation lights while COYOTE was underway, which prevented the look-out on LADY OLIVE MARIE from visually observing COYOTE in time to avoid collision. Scully is 100% at fault in the subject collision. Yarmouth and LADY OLIVE MARIE are without fault in the subject collision. Scully

has failed to prove any counterclaim against Plaintiff.

 4. An admiralty collision action to recover damages suffered by the crew of a damaged fishing vessel on lay shares is properly brought in the name of the owner of the damaged fishing vessel as trustee for the fishermen. *Carbone v. Ursich,* 209 F.2d 178 (9th Cir.1953) (Citing cases). These fishermen were obligated to the LADY OLIVE MARIE and could not obtain alternate employment. While the law of the Fourth Circuit on this question is not so clearly established as that of the Ninth Circuit in *Carbone,* supra, a review of the pertinent Fourth Circuit opinions lead this court to the conclusion that, when confronted with the same issue, the Fourth Circuit would allow commercial fishermen to recover their economic loss when a vessel on which they were working is damaged by a negligent third party, such as the defendant here. In *Henderson v. Arundel,* 262 F.Supp. 152, (D.Md.1966), aff'd, 384 F.2d 998 (4th. Cir.1967), the district judge expressly held, in what this court feels was dicta, that commercial fishermen could not recover, under identical facts as the instant case, in view of the ruling of *Robins Dry Dock & Repair Co. v. Flint,*[1] 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). The Fourth Circuit Court of Appeals merely affirmed on the opinion of the District Court without any discussion; thus, this court cannot determine whether the Fourth Circuit affirmed on the basis of the mentioned pleading defect or on the basis of the Robins Dry Dock rule.

In *Venore Transp. Co. v. M/V Struma,* 583 F.2d 708 (4th Cir.1978), which involved a claim by a charterer for loss of use of its charted vessel due to a negligent tortfeasor, the Fourth Circuit, stating that the Robins Dry Dock principle was not applicable, held that either the owner of the damaged vessel or the charterer, but not both, could be awarded damages for loss of use. The *Venore* opinion reviewed a number of Fourth Circuit and District Court opinions without indicating whether it approved or disapproved of the holdings, i.e., the Fourth Circuit merely stated that the principle of *Robins Dry Dock* was held to foreclose the seaman's lost wage claims in *Henderson,* supra, without any further elaboration.

In an exhausting study of the meaning of the Robins Dry Dock opinion, Judge Merhige, in *Pruitt v. Allied Chemical Corp.,* 523 F.Supp. 975 (E.D.Va.1981), allowed the claims of commercial fishermen under similar circumstances as the instant case. Judge Merhige determined that a contrary holding in *Henderson* had been dictum, see footnote 31, simply because the plaintiffs in *Henderson* were not fishermen. Finally, in *Adams v. Star Enterprise,* 51 F.3d 417 (4th Cir.1995), in affirming a denial by the district court of a claim by landowners against an oil distribution facility for contamination due to an underground oil spill, the Fourth Circuit discussed the meaning of *Pruitt,* supra, upon which the landowners relied stating:

> *Pruitt,* however, constitutes an exception to the general rule prohibiting the recovery of purely economic losses absent physical impact (footnote omitted). In cases in which a plaintiff's business is partially based upon the exercise of a public right, the plaintiff may be able to recover purely economic damages caused by a defendant's negligence in polluting the public resource upon which the plaintiff relies.

51 F.3d at 424–425. The Fourth Circuit continued its discussion by citing several cases and the Restatement (Second) of Torts § 821C, all of which follow the principle allowing recovery by commercial fishermen when a public nuisance pollutes public water-

---

**1.** This case is the basis of what is known as the "Robins Dry Dock" principal. In *Robins,* a plaintiff had chartered a ship that was negligently damaged while in dry dock. As a result of the damage and consequent delay, the plaintiff suffered losses. Rather than sue the ship's owner for breach of contract, the charter-party sued the dry dock. Justice Holmes, for the court held that

"the law does not spread its protection so far" as to protect a party from economic loss caused by unintentional torts by third parties against those with whom the original party has continued to do business. Therefore, if *Robins* was applied to this case, the economic losses of the fishermen caused by the defendant's negligence would not be recoverable.

ways and reduces their profits, because they suffer a particular harm distinct from the community at large.

There is clearly a split in the circuits and no direct holding by the Fourth Circuit on the issue raised herein, but based on the most recent statement of the law about this issue in *Adams,* this court is of the opinion that, when directly faced with this issue, the Fourth Circuit will follow the developing law that does allow recovery for commercial fishermen under the circumstances of the instant case. Moreover, neither efficiency nor economy would be served by a rule requiring the crew to file another action against the same Defendants in which relitigation of Defendants' liability would be collaterally estopped and the quantum of the crew's damages would be determined as a mathematical adjustment to the recovery in the instant case.

5. In admiralty actions, pre-judgment interest *shall* be awarded, absent special circumstances, *City of Milwaukee v. Cement Division, National Gypsum Co.,* — U.S. —, at —, 115 S.Ct. 2091, at 2095–96, 132 L.Ed.2d 148 (1995); *The PRESIDENT MADISON,* 91 F.2d 835, 1937 AMC 1375 (9th Cir.1937), as compensation for loss of use of funds to which Plaintiff was rightly entitled. *Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026 (5th Cir.1986). Yarmouth shall recover $3,837.23 interest, which amount is appropriate in the instant case as compensation for loss of use of funds to which Yarmouth was entitled.

6. Yarmouth shall recover $78,616.81 from Scully as Yarmouth's full actual damages including pre-judgment interest, of which $36,683.16 shall be Yarmouth's portion of actual damages, of which $38,707.98 shall be held in trust for the crew, and of which another $3,225.67 shall be held in trust for Capt. Belliveau.

WHEREFORE IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be entered in favor of Plaintiff and against Defendant David Scully, for $78,-616.81 actual damages with interest and taxable costs; and it is

FURTHER ORDERED that judgment be entered in favor of Plaintiff and against Scully on his counterclaim.

**IT IS SO ORDERED.**